THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RENALDO MATTHEWS, Defendant-Appellant.

First District (6th Division)   No. 1—86—2816

Opinion filed October 19, 1990.

374

Randolph N. Stone, Public Defender, of Chicago (E. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Jane E. Loeb, and Terence R. Whitney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Defendant was charged with 10 counts of murder, four counts of armed violence, two counts of theft and with other offenses. In a bench trial he was found guilty of murder, theft and armed violence and sentenced to natural life in the penitentiary for murder and five years on each theft conviction, all terms to be served concurrently. The armed violence conviction was merged with the murder conviction.

On appeal the defendant raises the following issues: (1) whether the court's denial of defendant's pretrial motions to quash his arrest, to suppress evidence and to suppress defendant's statement made while in police custody was error where defendant contends the arrest was illegal and the evidence and statement sought to be suppressed directly resulted from and are tainted by the illegal arrest and where the statement was involuntary; (2) whether defendant's conviction for felony theft should be reduced to misdemeanor theft where defendant contends the value of the items taken has not been proven to exceed $300 in value; (3) whether defendant's convictions must be reversed because the court made erroneous rulings at trial which constitute violations of the United States and Illinois Constitutions and thereby denied defendant a fair trial; (4) whether the court's imposition of a sentence of natural life without consideration of factors in mitigation was a violation of defendant's Federal constitutional guarantees; (5) whether the defendant was improperly sentenced under the mandatory natural life statute; and (6) whether judgments for murder were erroneously entered on counts I through X and for that reason, whether the mittimus must be corrected to judgments of conviction for murder and sentence on counts I and II only and the judgments on the remaining counts vacated because a defendant cannot be convicted of more than one offense arising out of the same physical act.

During the evening of March 11, 1985, at approximately 6 p.m., Tyrone Brown found Lorenzo Marvel and Ninette Scott shot to death in the kitchen of their home. During the investigation, the time of death was placed midday at approximately 11 to 12:30. Detectives Redmond and O'Leary responded to a double homicide complaint. During the investigation, defendant was named as one who might have relevant information. Detectives Lind and Markham of the Chi-

cago police department attempted to locate defendant and left Detective Lind's card at the home of defendant's grandmother with the request that the defendant contact them. On the morning of March 15, the defendant called and said he would be in to see the police later that day with his attorney. The defendant arrived at the station at about 9:15 a.m., without an attorney. At trial he stated that he was told he did not need to bring an attorney; the officers testified that the defendant appeared at the police station without an attorney and when asked if an attorney was on the way, defendant responded "no."

The detectives questioned the defendant and then left to check out his statements while the defendant remained at the police station. About mid-afternoon on March 15, the police officers returned and questioned the defendant again. They informed him that his answers contradicted information they had obtained in their investigation, whereupon the defendant was placed under arrest at about 3 p.m. on March 15.

From the time of his arrest until about 2 a.m. on March 17, when he gave an assistant State's Attorney a written statement confessing to the murders, the defendant remained in police custody, made no telephone calls and had not conferred with an attorney. Following his statement to the assistant State's Attorney, he was placed in the lockup and subsequently transferred to Cook County jail between 3 and 6 p.m. on March 17.

Before trial the defendant moved to quash his arrest, to suppress evidence and to suppress his statement on the ground that while in police custody he was denied sleep, food and access to toilet facilities, he was physically and psychologically abused, he was exhausted when he made his statement, and was never given his *Miranda* rights in a form he could understand nor was he permitted to phone an attorney or his family. Defendant argued that for these reasons the arrest was illegal and his statement was the result of an illegal arrest. He argued that the arrest should be quashed and the statement and evidence obtained as a result of the illegal arrest should be suppressed.

At the hearing on defendant's pretrial motions to quash the arrest and to suppress his statement and certain evidence, the court heard the testimony of the defendant, police officers Charles Lind, James Redmond, James O'Leary, Robert Evans, James Markham, Richard Kobel, polygraph examiner John Stout, Department of Corrections medical technician Clarence Spivey and Assistant State's Attorney Edward Schreiber.

Defendant testified that on the morning of March 15, he tele-

phoned and then went to the police station in response to the card left by Officer Lind with his grandmother because he believed the police wanted to talk to Marvel's friends as part of the investigation. He stated that he had not slept from about 4:30 p.m. on March 14 and that he had taken cocaine and cognac the night before he appeared at the station. He testified that when he arrived, Lind and another officer took him into a room where there was a typewriter and searched him. The officers took his phone book and identification and did not give them back to him. They then put him in a little room, pushed him and called him names and left a few minutes later. Defendant testified that when the officer searched him they did not find two cigarettes which had been dipped in PCP hidden in the waistband of his pants. He said he smoked one of them the first evening, March 15, and the second one sometime the next day. Defendant stated he was offered nothing to eat or drink nor was he given an opportunity to use the washroom until the next day, March 16. He denied that he had agreed to stay at the police station voluntarily.

Defendant testified that the next time he saw an officer was in the evening of March 15. He stated he kept asking to make a phone call but was told he could not. The officer left, and a short time later both officers came in and started to question him for about 20 to 30 minutes. The officers left to check his story. One officer offered him a bologna sandwich and coffee, but defendant told him he did not eat bologna or drink coffee.

Defendant testified that late that night when the officers asked him to take a polygraph test, they did not tell him he did not have to agree to the test or that the results of the test could not be used in court. He stated he asked to make a telephone call but was told he probably would be able to leave the station after the polygraph test. He stated he told the polygraph examiner he had no sleep the prior evening and that he was "kind of high." After the polygraph test he was placed in a lockup where he stated he was unable to sleep because he was nervous. Defendant stated he smoked part of his second PCP cigarette in the lockup and saved the remainder to smoke later in the day on Saturday, March 16.

He testified that he was taken from the lockup to an upstairs interrogation room at about noon on March 16. An officer told him Denise was coming to the station with his .32 pistol. An hour later two officers came into the interrogation room, called him names, told him he needed psychiatric help, pushed him around, grabbed him by the neck, twisted his arm behind his back, and elbowed him in the head. He stated that they demanded he cooperate with them and tell

them what happened on March 11.

He testified that he was given a cheeseburger and pop, but had no opportunity to use the phone to contact relatives. The officers also took a Polaroid picture of him.

Defendant testified the officers brought Warren Duncan to the station for questioning. Later the officers came into the room and told him that Duncan said he and defendant did not go to Marvel's apartment at 3 a.m. on March 11, and said defendant did not have any money and was lying to the police. He stated the officers then pushed him and hit him so that he said he would go along with whatever the police wanted just so they would not hurt him. The officers then told defendant what evidence they had and what people had told them and asked him if it was true, to which his response was "yeah, if that's what they wanted."

He testified he was forced by the police to go with them when they served the search warrant at Denise's apartment on Saturday evening and that he told her brother Poncho to have her bring defendant's weapon he had left at the house to the station. On the way back to the station, defendant stated, the police stopped and searched his cousin Sandra's apartment without a search warrant. He said he told "Lashon," who was in the apartment, to get in touch with his mother to let her know where he was and that this was the first chance he had to talk to friends or relatives. He stated when they returned to the station the officers told him he had to make a statement. He then smoked the rest of his PCP cigarette.

Defendant testified that at about 2 a.m. on Sunday, March 17, the assistant State's Attorney came into the room alone with some papers. He told defendant that what the officers said was true. He told defendant to sign the papers he had already prepared. Defendant stated he was coerced into giving his statement. He was then fed chicken and taken to the lockup.

On cross-examination defendant stated that he told Lind that on March 11 he talked to Marvel on the phone and then at about 2:30 to 3 a.m., Warren Duncan drove him to Marvel's apartment to purchase PCP. He stated that Warren waited in the car while he went up to the apartment. Before he left Marvel's apartment he telephoned his cousin Sandra to tell her to watch for him because he was on the way to her apartment. He stated Duncan dropped him off in front of Sandra's building. Defendant testified that he sat up and played cards and then went to bed. He woke up at about noon on Tuesday, March 12, went home to shower and change clothes, and at about 4 p.m. he and his girlfriend went to the Zanzibar Motel.

Defendant denied he told Lind that, in February 1985, he gave Marvel money, jewelry and a fur coat for some PCP which was too strong and that he took it back to Marvel to dilute it. He stated he diluted the PCP himself.

Defendant stated he was physically and mentally abused, deprived of food, sleep and the use of bathroom facilities and was refused the opportunity to telephone family or friends and to consult a lawyer. He stated that he was coerced into making the statement while exhausted and under the influence of drugs.

Police officer Charles Lind testified only at the hearing on defendant's motion to suppress. He stated that prior to March 15, he was involved in the investigation of the March 11 murder of Marvel and Scott and that the defendant's name came up during the investigation. Lind testified that on March 12 Barbara Russell told him that she talked to Scott early on the morning of March 11 and that Scott told her that she and Marvel were expecting the defendant to come by sometime that day. Russell stated to Lind that she knew Marvel dealt drugs from the kitchen of his apartment. Lind further testified that Russell stated she had talked to defendant on March 12, and that he had asked her if she had talked to Scott; that defendant told her he had not seen them for a while, and when Russell told defendant that Scott said they expected him to stop by on March 11, the defendant then told her he did go there that day.

Lind testified that on the day after the officers talked with Russell he spoke to Tyrone Brown, a roomer at Marvel's house. Brown stated that he knew Marvel dealt drugs, that he had seen defendant there several times, that he believed defendant was a drug dealer and had once seen defendant in a security guard uniform. Thereafter, Lind stated the investigators found a police record on Renaldo Matthews, a/k/a Hall, with an address in the 1400 block on Blue Island Avenue, that he and his partner, John Markham, went to that address and left a card with defendant's grandmother asking that she have defendant contact them.

Lind further testified that on March 15, at approximately 9 a.m., defendant appeared at the station alone in response to the message left with his grandmother and that defendant told them he decided not to have an attorney with him and agreed to talk with Lind and Markham. They went into an open conference room. Lind stated that Markham advised defendant of his rights and defendant stated he understood them and would talk with the officers.

Lind testified that defendant told them at the first conversation that he knew both victims, that he bought drugs from Marvel some-

time in the morning of March 11, that Marvel would not let him into the apartment and he made his deal through the front door, that he then went to his cousin Sandra's apartment in the 4300 block of South State Street and that he had been at the Zanzibar Motel with his girlfriend. He told the officers that in February 1985, he purchased some PCP from Marvel in exchange for a fur coat, a diamond ring and some money, that the drug was too strong and he took it back to Marvel to be cut. He told the officers that Marvel did not return the drugs, the fur coat, the diamond ring or the money and that he did not think Marvel treated him properly.

Lind testified they asked defendant if he would wait in the conference room while the officers checked his story and he agreed to do so. The conference room was not locked and the defendant was not handcuffed or otherwise restrained. The officers went to the Zanzibar Motel, found two registration cards for defendant. The registration cards indicated that defendant checked into the hotel on March 11 at 5 a.m., paid for 12 hours and later paid more money for additional time, and that he checked in again on March 12. The officer also went to defendant's cousin's apartment on South State Street. He stated she told them defendant had been staying with her for about a week and was in and out during the whole time.

Lind testified that he and Markham returned to the station at about 2:30 p.m. and found defendant waiting in the unlocked conference room. The officers told defendant that in checking his story they obtained information which did not agree with what he told them. The officers then told defendant that he was no longer free to leave, was in custody and would have to remain at the station while they investigated further. Lind stated they took defendant to an interrogation room, locked him in and prepared the arrest documents. Lind stated that defendant was not handcuffed, verbally or physically abused, or denied the use of the washroom when he requested it. He further stated that defendant did not ask to talk to a lawyer or to family or friends nor did the officer smell drugs on his person or in the room.

Lind stated he and Markham briefed incoming Detectives James Redmond and James O'Leary, who took over the investigation at the end of his shift at 5 p.m.

Officer John Markham testified that on March 15, defendant appeared at the station shortly after 9 a.m. in response to a card his partner Lind and he had left with defendant's grandmother. Markham asked defendant where his attorney was. Defendant responded he did not need one. Markham patted defendant down, told him to empty his pockets and then asked him to put everything back. Markham's testi-

mony confirmed Lind's prior testimony. Markham added that prior to talking with defendant upon their return to the station at about 2:30, he advised defendant of his rights again and defendant stated he understood. Defendant did not ask for an attorney. He was not coerced or abused nor did he ask to contact family or friends. Markham stated that neither he nor Lind misrepresented the investigation to the defendant. Markham testified that, after the first conversation with defendant, he and Lind went to the Zanzibar Motel, then spoke with Chris Bridges whom defendant identified as his girlfriend, and spoke with defendant's cousin, Sandra Hampton.

Officer James Redmond testified that on March 11 he was on duty from 4:30 p.m. to 1 a.m. on March 12. At about 7 p.m. on March 11, he responded to a report of double homicide at 4465 S. Lake Park, which was a three-story townhouse. He observed two bodies located in the kitchen just inside the rear entrance. He spoke with Tyrone Brown, who said he left the victims about 11 a.m. that day and returned at 6 p.m. and found them dead. Brown told Redmond that when he arrived home he found a note on the door from a telephone company employee which stated the employee had been there at 12:45 and missed the occupant. Redmond testified that in the second-floor bedroom he found several hundred manila envelopes and a large quantity of "snow seal packets." He talked to other family members about the deaths and turned the investigation over to other detectives when he went off duty. His next contact with this investigation was on March 15 at 4:30 p.m.

Redmond testified that Officers Lind and Markham briefed him and James O'Leary, his partner, on the investigation and advised them that the defendant was in custody. Prior to talking to defendant, O'Leary advised him of his rights and defendant acknowledged that he understood them. Redmond and O'Leary asked defendant about earlier statements he had made, and he gave a brief account of his actions on March 11. They asked defendant if he would take a polygraph test, and defendant agreed to do so. At 7 p.m. the officers drove defendant, who was handcuffed during the ride, to 11th and State, where the test was administered by John Stout after he had been briefed on the investigation up to that point.

Redmond testified that after the test, Stout told them the defendant was not telling the truth and was withholding information and stated that defendant could possibly be the offender. The officers brought defendant back to the station about 8:30 p.m., where he was given bologna sandwiches and coffee and he used the bathroom before being locked in the same interrogation room.

Redmond stated that Warren Duncan had been located and was brought to the station. Although defendant had previously told the officers that Duncan had driven him to the victims' apartment in the early morning hours on the day of the murder, Duncan denied that he was with defendant during the morning hours of March 11.

Redmond testified that on March 16 at about 1:45 a.m., he and his partner took defendant to the lockup for the night and that defendant stated he had lied to police earlier about two weapons. Defendant told the officers he owned a .357 magnum and they should contact his girlfriend about the gun.

Redmond stated his next involvement with the investigation was during the evening of March 16, when he asked the defendant about items taken from the victims' apartment. He and other detectives reviewed the case after executing search warrants.

Police officer James O'Leary testified that he and his partner went to the homicide apartment on March 11 to examine the scene for evidence. He stated they found no indication of forced entry. His testimony about his investigation at the scene on March 11 was substantially the same as Redmond's testimony.

O'Leary testified that his next contact with the investigation was on March 15 at 4:30 p.m. when he and Redmond were briefed about the investigation by Markham and Lind and he learned the defendant was in custody. O'Leary testified that he advised defendant of his rights and he and Redmond interrogated defendant about his activities on March 11. Defendant agreed to take a polygraph test. O'Leary confirmed Redmond's testimony of transporting defendant to and back from the polygraph examination, giving defendant food and use of bathroom facilities and defendant's statements about the guns as he was placed in the lockup for the night.

O'Leary testified that when defendant was brought back from the polygraph examination, O'Leary told him they were going out to Warren Duncan's house to question him.

O'Leary testified that Warren Duncan was brought to the police station because defendant had told the officers that on March 11 Duncan had driven defendant to the Lake Park address in the morning. O'Leary stated that Duncan denied driving defendant to Marvel's apartment and denied that he saw him during the morning of March 11. Duncan admitted to the officers that he had purchased drugs from the defendant on a number of occasions and that he contacted defendant on March 11 for the purpose of taking him to Marvel's apartment to buy narcotics. He told the officers that defendant told him that was not necessary because he had some PCP to provide to Duncan. Dun-

can told them he went to defendant's apartment and noticed defendant had some PCP, a "wad of money" and jewelry. Duncan told the officers he was surprised at this because two days earlier defendant had no money to purchase drugs, appeared broke and had no jewelry at all. Duncan acknowledged that on both Saturday and Sunday prior to the homicides he saw defendant with a .357 or .38 caliber snub nose and that defendant always carried a gun when he went out.

O'Leary testified that the defendant was not physically abused nor was he denied food, sleep or use of toilet facilities.

Officer Robert Evans testified that on March 16 he and his partner, Robert Kobel, worked the 8:30 a.m. to 5 p.m. shift and that when they came on duty they learned defendant was in custody for the March 11 double homicide. Evans testified he had no prior knowledge of the case and read the investigation reports which stated defendant had not passed the polygraph test the day before.

Evans testified he went to Chris Bridges' apartment, that she acknowledged she was defendant's girlfriend and told him she believed defendant only carried a gun during the time he had been employed as a security guard.

Evans stated he went to the Palace Loan Company pawnshop on East 47th Street, where he talked to Al Burton. When shown a photo, Burton identified defendant as a regular customer and produced several receipts of recent dates which showed that defendant pawned and then reclaimed various items. The last receipt was dated March 13 for a watch reclaimed that date which had been pawned on March 9.

Evans testified that when he got back to the station he and his partner brought defendant from lockup at about 11:15 to 11:30 a.m., and placed him in the locked interview room. Evans stated he advised defendant of his rights and questioned him for about 20 minutes. Defendant denied any involvement in the murders. Evans testified that Kobel then questioned defendant but Evans was not present for that interview. Evans then gave defendant hamburgers, soft drinks and cigarettes.

Evans testified that based on information from the defendant that one of the homicide weapons could be located at the residence of Jerome Williams, Evans obtained a search warrant for Williams' apartment. He testified that he, Kobel, Redmond, Officer Joseph Murphy and defendant went to Williams' apartment to execute the search warrant at about 9:30 p.m. on March 16. Evans testified that defendant stated he wanted to go with the officers to Williams' apartment to tell his cousin that everything was okay and that the police were

there just to find the weapon defendant had given Williams earlier. Evans testified they found no weapon.

He stated that when they returned to the police station at about 11:30 p.m., Redmond questioned defendant in Evans' presence and defendant admitted taking jewelry and cash from Marvel's apartment on March 11.

Evans testified that he and Kobel were present at 1 a.m. when Assistant State's Attorney Schreiber questioned defendant, who made his oral statement. Thereafter, Schreiber prepared a written statement and, at 2 a.m., after reviewing the written statement with Schreiber and making some changes, defendant signed the statement. Evans then brought defendant out into the general office area, where defendant was given a chicken dinner and soft drink. Evans stated that in his presence defendant did not ask to make any phone calls.

Officer Richard Kobel testified generally to the same events as did his partner Evans. Kobel stated that prior to March 16, he had never seen the defendant but knew he had been in the station for more than 24 hours. He testified that he spoke with defendant alone from about 12:30 to 1 p.m., after advising him of his *Miranda* rights, and defendant then was given some lunch.

Kobel stated that defendant was not under the influence of alcohol or drugs while in his presence, that defendant was not abused, coerced or prevented from contact with family, friends or lawyer, that defendant did not complain of injuries nor did Kobel see any. No misrepresentations were made to defendant.

Assistant State's Attorney Edward Schreiber testified that he was assigned to felony review from 7 p.m. on March 17 to 7 a.m. March 18. At about midnight on March 17, he was called to Area One Violent Crimes in connection with the investigation of the murder of Marvel and Scott. He spoke with Officers Evans and Kobel, who advised him they had a suspect in custody and briefed him on the investigation. He read the reports.

At about 11:50 a.m., March 18, he talked with defendant in the presence of Evans and Kobel after advising defendant of his constitutional rights, which defendant acknowledged he understood. Schreiber testified that defendant was alert and responsive at all times. After making notes of defendant's oral statements, Schreiber went into the general office area, and prepared a written statement from his notes, which he then reviewed with defendant in the presence of Evans and Kobel. Defendant pointed out some corrections which were made, he reread the statement and signed it. Schreiber, Evans and Kobel all signed as witnesses. Schreiber stated he then went into the general

office area to prepare his felony review folder and next saw defendant eating chicken out in the same general office area while joking with Kobel, Evans and others present. Schreiber stated there was no further discussion about the investigation at that time and that defendant seemed in good spirits. He stated defendant was not handcuffed or physically, verbally or emotionally abused in his presence.

Clarence Spivey testified that he was the medical technician at Cermak Health Services on March 17, sometime between 3 and 6 p.m., when defendant was screened as an incoming inmate. He remembered the defendant. He identified the medical history form he prepared at that time in part from information given to him by defendant and in part from his own testing and observations. He stated that if defendant had complained of distress or mistreatment while in police custody or if defendant stated he was using drugs, Spivey would have noted it on the form. No such notations appear on the report.

We find significant the fact that the testimony established that in the evening of March 15, the defendant voluntarily agreed to take the polygraph test, which he failed to pass, and during the evening of March 16, the defendant willingly accompanied police officers to the residence of defendant's cousin, Jerome Williams, to locate weapons pursuant to a search warrant issued based on information provided by defendant.

The court denied the motions to quash the arrest and to suppress the defendant's statement. In doing so the court stated:

"THE COURT: There is no question that this man was under arrest when he arrived at Area 1 violent crimes and was placed in the interview room when that door was locked and that period came shortly after he went there voluntarily.

However, this was a matter under investigation, active investigation by the police, and they had some information that Mr. Matthews might have had some involvement in this matter, and this matter being under investigation, although the court is very critical of the procedures adopted by the police in this instance, Mr. State's Attorney, and would hope that you would or through your office indicate the court's criticism of the procedures by holding some person incommunicado as it were for the period of time that the evidence discloses was done in this case, the court does not feel that the matter was so aggregious [sic] as to overbear the will of Mr. Matthews under the circumstances that were disclosed so therefore the motion to quash the arrest will be denied.

The court also finds that the court does not believe Mr. Matthews when he says that he was not advised as to his constitutional rights by any police officer and by no one until he was so advised by the state's attorney. The court doesn't believe that. And so therefore this being a matter that is based upon the credibility of the witnesses and the availability of the witnesses, the court will opt to believe that the police followed the prescribed procedures and did give him his constitutional warnings and that he did make statements and that when he made those statements he understood the rights he was giving up by making those statements both oral and written so the motion to suppress statement will be denied."

The defendant waived a jury.

At trial the State produced 13 witnesses and the stipulated testimony of seven additional witnesses. Thereafter, defendant testified on his own behalf, produced one witness who testified, and produced the stipulated testimony of two additional witnesses.

The State called Dennis Marvel, the son of the victim Lorenzo Marvel. He testified that he had spoken to his father approximately one week prior to March 11, and had last seen him four weeks prior to March 11. He stated further that he identified his father's body at the medical examiner's office. He identified a photograph of his father which showed a Seiko watch and a ring worn on the small finger of his right hand. He identified a diamond ring and a Seiko watch as the same jewelry in the picture and the same jewelry shown to him by the police for identification within a week of his father's death.

Kevin Scott testified that Ninette Scott was his sister and that in March 1985 she lived in the 4400 block of Lake Park. He stated he talked to her on the phone on March 7 and saw her on March 9, and that she appeared to be in good health. He testified that on March 12 he identified her body at the Cook County medical examiner's office.

Thomas Carter testified that on March 13 at about 9 p.m. the defendant approached him on the street near 3816 South State Street and told Carter he had a gun for sale for $50. Carter testified he later met defendant at 3737 South Federal, where defendant sold him a loaded .357 caliber hand gun for $50. He identified the gun in evidence as the same gun he had purchased from defendant. He stated that a couple of days after he bought the gun, officers came to 3549 South Federal and he turned the weapon over to them.

On cross-examination Carter testified that when he went to 3737 South Federal to purchase the gun, Marcus Burruss was with the defendant. While Carter and defendant talked in the hallway outside

of apartment 101, Marcus was on the porch. Both defendant and Marcus went into apartment 101 and when they came back outside defendant had the gun. Carter described Marcus Burruss as the same or a little taller than 5 feet 5 inches with light brown skin. He acknowledged that he had previously been convicted of a narcotics crime but that his probation for that crime had terminated.

Chicago police detective James O'Leary testified that on March 11 he went to the homicide scene. He described the interior of the house and identified photographs of the premises and the two victims as they were found on the kitchen floor. He described the bedroom: clothes thrown about, drawers pulled out and turned over, beds pulled off box springs, and stated that the room had been thoroughly searched and ransacked.

O'Leary identified a white towel with holes in it and powder burns which was recovered from the first-floor sitting room. He described two gunshot wounds behind the left ear of Scott and two gunshot wounds behind the left ear of Marvel and identified photographs of the victims. He identified an Illinois Bell tag found on the door given him by Tyrone Brown which indicated that a telephone company representative had attempted to gain entry at 12:45 p.m., and no one responded to knocks on the door.

O'Leary testified that other items were recovered at the scene. Specifically, a knife was on the floor next to Scott's body, and various drug paraphernalia was found in the upper bedroom. He stated that during the investigation he determined that this residence was considered a "dope house" and that Marvel had been selling drugs to various people who would come to the house.

O'Leary testified that thereafter on March 15 he and Redmond continued the investigation, taking over that day from Detectives Markham and Lind, who told him that defendant was in police custody. He and Redmond spoke with defendant regarding the homicide investigation.

Cornell Murray was called as a witness by the State. He testified that he had known defendant for about four or five years, that in early March 1985, he went with defendant to a house on Lake Park, that he did not go into the house but waited outside until defendant came out, and that they then went to the home of defendant's cousin. Over defense objection, he admitted that when he testified before the grand jury he stated that defendant said he was going to kill those people. Over defense objection, he stated that he also told the investigating police officers that defendant told him he was going to kill those people that lived on Lake Park.

Murray testified that on March 11 defendant called him and Murray then met defendant under the building at 4352 South State Street. He denied that he saw defendant with PCP and money at that time and denied that defendant told him he had killed those people on Lake Park. He admitted that he had told the police and had testified to the grand jury that defendant told him he had killed the two people on Lake Park.

On cross-examination, Murray denied having seen defendant using PCP or smoking charm sticks. He stated that sometime after March 11, he thought it was March 19, he went to the police station. He stated in response to police questions that he got out of school on March 11 at 2:30 p.m. The police told him they thought he might be involved in the murders, and he stated he was frightened when they started to ask him questions about defendant. He stated that on March 19 he did not know defendant had been arrested.

Barbara Russell, called by the State, testified that she had known Scott and Marvel since childhood, that she was very close to them and that in 1985 they were living together in the 4400 block of South Lake Park. She testified that she knew Marvel dealt drugs and that she had met defendant through Marvel and knew him by the name of Rene. She identified him in court. She testified that she spoke with Scott on the phone during the evening of Sunday, March 10, and that Scott was having trouble with the phone line.

Russell testified that at about 4 p.m. on Tuesday, March 12, she received a telephone call from defendant, who asked her if she had talked to Scott or Marvel. She responded no and asked him if he had not heard that they were killed. She testified that defendant asked her when she last spoke to the victims and when she responded March 10, he told her he had talked to them the day before that. Russell then told defendant that Scott told her they expected to see defendant on March 11. He then stated "yes, I did see them" (the victims) at their home.

On cross-examination Russell testified that defendant told her he went to the Lake Park address "on Monday" and picked up a package but that he did not tell her an exact time. She denied that he told her this on Sunday night. She testified that she had the phone number of defendant's grandmother as a way to reach him. Russell testified that she spoke with Detective Markham on March 12 after she had spoken with defendant.

Denise Williams identified defendant and acknowledged him to be a distant relative. She testified that on March 13 at about 2 p.m. she and a crowd of other people were in the community room, apartment

105, at 3737 South Federal when defendant came in to talk to her. She testified he told her that "he had got rid of them mother fuckers. He was okay now." She testified that on March 18 under oath before the grand jury she testified that in that conversation he said "I got those two mother fuckers. I am all right now." She stated further that on March 13 when he made that statement she pulled him aside away from the others and went into one of the other rooms in the apartment where she had a long conversation with defendant. She stated defendant talked about a drug-related deal on Lake Park where he went because he had given the man some fur or jewelry or something, that he and the man got into an argument and the man reached for a gun. She testified defendant told her he got the gun away from the man and shot and killed him and then the lady. Williams testified that defendant told her he killed them with a .357 caliber gun, then took some PCP, some jewelry, a .35 caliber pistol and approximately $2,500.

On cross-examination Williams stated that she had known defendant for more than 20 years and that in the last year "he was acting real crazy." She stated that when she saw him on March 13, he was "gone," "real high" on drugs. She stated that she had heard on TV and the radio the night before that two people were killed on Lake Park. When she spoke with defendant they talked for an hour. She testified that defendant told her he was king of the area now, everybody had to come through him. Williams stated that defendant always boasted to make people think he was more important than he was. Williams stated that it was just weird to her when on this date in front of a crowd of people defendant walked in and said he had gotten rid of those mother fuckers.

Williams further testified that defendant told her Conrad was with him and after the murders Conrad got a cab for defendant to leave. She testified that Conrad and defendant were always together and that she did not know if Conrad was in school at 2:30 on March 11.

Detective Redmond testified that on March 11 he became involved in the investigation of the deaths of Marvel and Scott and that he first saw and interviewed defendant, who was in custody, on March 15 at 5 p.m. He testified that he and Detective O'Leary advised defendant of his rights and asked him if he would be willing to take a polygraph test regarding the investigation. He testified that when questioned the defendant told him that he had been at the victims' apartment on the morning of March 11 with Warren Duncan and purchased drugs through the door.

Redmond stated that he and O'Leary interviewed Duncan. He stated that he and O'Leary then talked with defendant and told him that Duncan stated he was not with defendant at that address on the morning of March 11, but that he had been there with defendant on the prior two mornings to purchase drugs. Redmond testified that he told defendant that Duncan stated he saw defendant in the projects later in the afternoon of March 11 and that defendant had in his possession a bottle of PCP, a large roll of cash and some jewelry items Duncan knew were previously pawned by defendant. Defendant told Redmond that Duncan was mistaken.

Redmond testified that while waiting with defendant outside the lockup that night defendant admitted he had lied to the police earlier about the .357 caliber weapon and told Redmond that he had the gun while he was in the motel room with his girlfriend, Christy, and that when he woke up she and the gun were gone. He suggested they interview her because she is the type of girl who would shoot the victim or have somebody do it.

He testified that on March 16 he again spoke with defendant in the presence of Detectives Kobel and Evans and at that time defendant admitted he had taken from the victims' residence approximately $250 in cash, some PCP, a gun and some jewelry, a watch.

On cross-examination Redmond acknowledged that on March 15 he and his partner spoke with defendant on at least three occasions and that each time he denied any involvement in the shooting deaths under investigation but that defendant admitted he knew Marvel and bought or traded drugs with him. Redmond acknowledged that defendant told him that during the morning hours on March 11 he had picked up some drugs from Marvel.

Detective Markham testified that on March 12 he and his partner, Lind, talked to Sipio Baker and Barbara Russell regarding the investigation. After those conversations, Markham obtained the name of Renaldo Matthews, a/k/a Rene Hall, from police department records and determined that he wanted to talk to that individual about the investigation. He testified that he and Lind went out to the home of defendant's grandmother and left a business card asking that defendant call them.

Markham testified that defendant first telephoned, then appeared at the police station on March 15 at about 9 a.m., and that he came without a lawyer, stating to them that he did not need a lawyer. Markham, his partner, Lind, and defendant then went into the conference room.

Markham testified that during that day he and his partner went

to the Zanzibar Motel, later talked to other individuals regarding the investigation, and returned to the police station at about 2:30 p.m. After he and Lind advised defendant of his constitutional rights, defendant agreed to talk to them and told them that on March 11 he carried a .32 caliber automatic weapon for protection. Defendant first stated that the gun was in his cousin's apartment at 4352 South State but later stated the gun really was at 3739 South Federal at a friend's apartment.

Markham testified that on March 19, while he, Lind and Kobel were working on the investigation, Thomas Carter telephoned in to the station. After the telephone call, these officers went to meet Carter at 3549 South Federal. Markham stated that Carter gave the police a .357 caliber Colt revolver containing four live .38 caliber rounds. Markham observed what appeared to be blood and hair on the gun. He took the gun to the police crime laboratory, where it was inventoried.

On cross-examination Markham could not state that Carter was also known as Tom Slick. Markham acknowledged that on March 15, he and his partner had two conversations with defendant and that defendant denied that he shot or had been involved in the shooting of the victims, either directly or indirectly. Markham also acknowledged that when he and his partner went to the Zanzibar Motel, they learned that defendant had been there on March 11.

The State next called Jerome Williams. Williams testified that on March 14 at 9 a.m., he was with defendant and Marcus Burruss. He stated they were on the way to court but stopped at the pawnshop on East 51st Street because defendant had some jewelry, a ring and a watch, he wanted to pawn. When they got to the pawnshop, defendant stayed in the car, Burruss went into the shop and Williams stayed outside. When Burruss came out of the shop he had the pawn slip, which he kept, they got into the car and drove to court where defendant was to appear on a case.

On cross-examination, Williams stated he saw defendant March 10, and then on March 14, as he testified. He stated that defendant was talking real fast and seemed to be high and that he knew defendant dealt drugs. He testified that defendant asked Williams to drive him to court because he was late and he needed some money. He stated he did not see defendant hand Burruss the jewelry to pawn. He denied the defendant left a gun and PCP in his apartment. He testified that defendant told him after court he was going to his grandmother's home to change clothes and would be back later, but that he did not see defendant again that day.

Keith Burruss testified that on March 13 at 8 p.m., defendant approached him at 3739 South Federal about some "happy sticks," some PCP and said he had an amount of it. Burruss told defendant he did not know anyone who dealt with it. Burruss testified that defendant then told him that he had killed someone out south, but Burruss took it as a joke and walked away from defendant. Burruss identified a ring in evidence as the ring defendant was wearing on March 13.

On cross-examination he again identified the ring, but stated he was not familiar with the watch admitted into evidence. He acknowledged that Marcus Burruss is his brother, but stated he had not seen his brother in three months and further stated that he had never seen his brother with this ring or this watch and did not know if his brother had pawned them. He acknowledged that he knew Tom Slick, who was a friend of his brother. He believed defendant was high on drugs on March 13. He stated he first learned of the homicides out south the next day from a newscast.

Detective Robert Evans testified that on March 16 he and his partner, Kobel, were assigned to continue the investigation of these homicides and knew that defendant was in custody as a suspect. He stated that on the evening of March 16, Assistant State's Attorney Schreiber from the felony review unit arrived between midnight March 16 and 1 a.m. on March 17. He was briefed on the investigation. Evans testified that Schreiber then talked with defendant after giving *Miranda* warnings, in the presence of Evans and Kobel. He stated Schreiber left the room and Evans gave defendant food he had earlier purchased for him. He testified that Schreiber prepared a handwritten statement, which he then went over with defendant. Defendant made and initialed corrections and after reading the entire statement signed the statement. Schreiber, Evans and Kobel also signed as witnesses. Evans identified the statement admitted into evidence and identified the signatures on the document.

Evans testified that on March 17, he and Kobel went to United Loan Company on East 51st Street and talked to Mr. Scott. He testified that Scott gave them a wristwatch and a ring and that later Dennis Marvel, the victim's son, identified those items as his father's jewelry. Evans identified the ring and wristwatch admitted in evidence as the items obtained from the pawnshop.

On cross-examination Evans testified that he had obtained the pawn ticket for these items from Marcus Burruss. Evans stated that he did not know how long defendant had been in custody prior to the arrival of the assistant State's Attorney sometime between midnight and 1 a.m. on March 17. He did not know how many policemen had

talked to defendant prior to that time. He stated that after defendant signed the statement he was given food.

The State read into the record the signed summary statement of defendant which in pertinent part was as follows:

"He was an associate of Lorenzo Marvel. They had business dealings, usually regarding drugs in the past. Recently Mr. Matthews said, he had loaned Mr. Marvel a lot of money—several thousand dollars. Mr. Marvel was supposed to go to California and purchase two gallons of PCP which they were to split when he returned.

Later Mr. Matthews learned that Mr. Marvel had used at least some of the money to buy a new Cadillac and this made Mr. Matthews upset. On March 11, 1985 he went over to Mr. Marvel's home at 4465 South Lake Park in Chicago to try to settle some business. Mr. Matthews said he brought his .357 Magnum revolver which he kept in his pants under his coat just in case things got out of hand. He arrived approximately 10:30 a.m. Mr. Marvel was home as was his girlfriend, Ninette Scott.

They invited him into their home. Mr. Matthews said he was concerned because Marvel owed him a lot of cash and he just wanted to get his money. After entering the house, Mr. Matthews said he waited in the T.V. room while Miss Scott and Mr. Marvel went into the kitchen to talk. Mr. Matthews said it seemed to him that they had been in the kitchen a long time and he didn't like it, so he went into the kitchen to find out what was going on.

When Mr. Matthews entered the kitchen door, Mr. Marvel and Ms. Scott were standing on the other side of the room, about ten to twelve feet away. Suddenly, Mr. Marvel lunged for a nearby cabinet where he kept a .32 caliber revolver so Mr. Matthews said he quickly drew his own .357 gun and shot Mr. Marvel before he could reach the gun. At that time, Miss Scott, who was holding a butcher knife, reached over Mr. Marvel who had fallen to the floor facing Mr. Matthews and she too tried to get to the .32 revolver so Mr. Matthews shot her, too. He then quickly shot both Mr. Marvel and Miss Scott again.

Mr. Matthews said he was wearing gloves, which were his own gloves that he had brought with him. Seeing that Marvel and Scott both appeared dead, Mr. Matthews said he picked up a towel from the kitchen and used it to pick up the .32 revolver from the cabinet. He said he did not want to touch the gun. He then picked up two and a half ounces of PCP from a bottle

which was on the table and put it in a bag with the .32 and his own .357 gun.

Mr. Matthews said previously he had left some jewelry in the house so he went looking around the house for it and some of the money Marvel owed him. Mr. Matthews said he found two rings and his watch and about Two Hundred Fifty Dollars United States Currency and put it all in the bag too. He put the towel on a chair in a front room and at about noon he left.

Mr. Matthews said he took the .32 revolver and the PCP and gave them both to his cousin, Denise Williams (he is not sure of her last name because she has been married) at her apartment at 3739 South Federal, Apartment 802. He told her to sell the PCP for Six Hundred Dollars and to give him back Four Hundred Dollars. Mr. Matthews said he pawned the watch at the 'Palace Pawn Shop' and gave the ring and the .357 revolver to a friend, but he does not remember the friend's name at this time."

Dr. Joanne Richmond testified that on March 12 she was an assistant medical examiner employed by the Cook County medical examiner's office and on that date she performed the autopsies on the bodies of Marvel and Scott. She identified a series of photos of the victims and described their wounds.

Richmond identified three gunshot wounds to Scott's head which she testified were all caused by contact firing. The first entered the right temple, passing through the tongue and fracturing the jaw bone and exiting beneath the left side of the jaw bone. The second contact firing gunshot wound entered behind the left ear, tunnelled under the skin of the scalp and exited on the right of the back side of the head. The third shot entered behind the left ear, passed into the brain cavity through both sides of the brain. The witness testified she recovered a deformed lead bullet on the right side of Scott's brain. She described an atypical gunshot wound to the left arm and recovered a deformed lead bullet in muscle just below the entry wound. She stated that an atypical wound does not have the usual characteristics of an entrance wound because the shot passes through something prior to going through the skin. The last wound described was an incised wound or cut to the left of the neck measuring two inches across the skin.

Dr. Richmond testified that Marvel suffered a gunshot wound behind the left ear. The bullet entered the brain cavity, passed through the brain from left to right straight across, exiting at the back side of the head. Richmond described a second gunshot entry wound behind

the left ear, passing through the bones on the floor of the skull. She stated she recovered a deformed bullet on the right interior side of the skull. Both of Marvel's wounds were caused by contact firing.

Dr. Richmond identified photos of the victims showing the wounds described. She stated that the cause of death for each victim was multiple gunshot wounds to the head.

The State concluded its case with the stipulated testimony of seven witnesses. Randall Slaton, a telephone repair technician with Illinois Bell Telephone, would testify that on March 11 at 12:45 p.m. he was at 4465 South Lake Park regarding trouble with the telephone. When no one answered the door he left a card at that location indicating the date and time of his visit.

Marcus Scott, an employee of United Loan Company, would testify that on March 14, a watch and a ring were pawned under pawn number 44846. It was also stipulated that Scott would not identify defendant as the person who pawned the items.

Al Bruton, an employee of Palace Loan Company on 216 East 47th Street, would identify defendant as a regular customer. He would testify that in the month prior to March 11, defendant had been in the shop twice. On February 18, defendant pawned a watch for $15 and retrieved it on March 7. On March 9, defendant pawned a wristwatch for $20 and retrieved it on March 13 for $22. Bruton would testify that after that date defendant had no other property at this pawnshop.

Chicago police officer R. Vaikie, assigned to the mobile crime lab, would testify that on March 11 he processed the scene at 4465 South Lake Park, taking pictures of the scene as well as various blood standards and fingerprints from the victims. Vaikie would testify that he recovered from the scene a white towel found on a chair (People's exhibit 8), one kitchen knife with a 10-inch blade, two dark brown plastic bags, a CTA transfer, and various samples from the floor, all of which were submitted to the crime lab for analysis.

Jean N. Goliak, a criminologist II assigned to the Chicago police department, microscopy and trace unit, would testify that she examined certain evidence from the homicide scene, including a soiled white towel with three perforations, each measuring $1\frac{1}{4}$ by $1\frac{1}{2}$ inches. Goliak would state further that around the peripheries of these perforations gunpowder residue was present which resulted from "contact or near contact muzzle distance from the object." Goliak would testify that she conducted a microscopic examination of a revolver (People's exhibit 17) received from Detective Vaikie and found white cotton fibers adhering to the barrel which were similar to

the fibers of the white cotton towel which she had also examined.

Pamela A. Fish, a criminologist assigned to the serology unit of the Chicago police department, would testify that she conducted preliminary chemical tests of blood on the "abstract of the revolver" in evidence (People's exhibit 17), which revealed "positive action." She would testify that further testing indicated an "insufficient amount of blood."

Sergeant Donald E. Smith, a Chicago police department firearms examiner, would testify that he test-fired a .357 Magnum revolver (People's exhibit 17) and made a comparison of the test firings with the bullets recovered by the medical examiner from the bodies of Marvel and Scott. He would testify that the bullets recovered from Marvel's body had been fired from People's exhibit 17. He would testify that the bullets recovered from Scott's body were consistent with People's exhibit 17, but due to mutilation of the bullets, there were insufficient class characteristics for a definite identification.

The defense offered the stipulated testimony of Kevin Russell, the manager of the Zanzibar Motel, who would identify defendant as the person who checked into the motel on March 11, paying for eight hours. He would also testify that defendant later paid $22 for additional time that same day. Russell would testify that defendant arrived again on March 12 at 5:30 a.m. and checked out at 6 p.m. that same date.

Defendant offered the stipulated testimony of Michael Schaefer, a Doctor of Philosophy in Toxicology, employed by the Forensic Institute of Cook County. He would testify that on April 9 and April 17, he examined blood and urine samples taken from the bodies of Marvel and Scott. He would testify that in Scott's blood he found 2.51 micrograms per millimeter of benzoylecgonine, which is a substance produced when cocaine is metabolized by the human body, and found 310 micrograms per millimeter of this substance in Scott's urine. As to Scott, he would further testify that he found phencyclidine in amounts of .3 micrograms per millimeter in her blood and 1.0 micrograms per millimeter in her urine. Schaefer would testify that in Marvel's blood he found benzoylecgonine in the amount of 3.14 micrograms per millimeter and 364 micrograms per millimeter in the urine. He would testify that he found phencyclidine in Marvel's blood in the amount of 5 micrograms per millimeter and in the urine .6 micrograms per millimeter.

Excell Jones testified for the defense. She stated that on March 11, 1985, she lived at 4469 South Lake Park Avenue, that she arrived home between 11 and 11:15 a.m., and shortly thereafter she was

working at a desk in the bay window area on the second-floor front room of her home. She testified she was there about 10 minutes when she heard the squeak of the outer gate of her neighbor to the north, 4465 South Lake Park Avenue. She testified she saw two men there whom she had never seen before. Jones described the man she saw going through the gate as between 5 feet 11 inches and 6 feet 2 inches, medium build, perhaps a clothing size 42 or 44, light mulatto or Creole complexion, good looking, and possibly with a moustache. She testified she thought he wore a dark cap and she could see his hair on the side above his ears. He wore no uniform. When he was outside the gate he looked up at the window at 4465 and then up at her window. Defendant was asked to stand and she testified he was not the man she saw at the gate. She did not describe the second man. She testified she heard nothing unusual from the time she saw the men to the time she left home at about 4 p.m.

On cross-examination, Jones testified that she saw the man coming through the gate at about 11:30 or 11:45 a.m., but no later. She did not see him inside the gate and at no time did she hear shots that day.

Defendant testified that he worked as a security guard and was also selling cocaine and PCP. He described himself as the middle man in the chain of supply and testified that he got large quantities of drugs for 30 to 40 people, among them Lorenzo Marvel. He stated he would use money or jewelry to pay or exchange for drugs. Defendant testified that he owned three diamond rings, a Longine watch and two gold chains, and on days when he did not make anything from drug dealing he would often pawn his jewelry at the Palace Loan Company. He stated he did not pawn his jewelry anywhere else.

Defendant testified he had known and been dealing drugs with Marvel for three or four years. He stated he knew Marcus Burruss, who also dealt drugs and knew Marvel, and described Burruss as light colored, about 5 feet 10 inches or 5 feet 11 inches, with a moustache. Defendant testified he knew Thomas Carter, who testified for the State, as Thomas Slick and that Carter and Burruss were good friends.

Defendant stated that in March 1985, he used PCP and cocaine but could not say what quantity he used. He described the effect of the drugs as causing him to be forgetful, to hallucinate or imagine he was bigger than he was. During the week from March 10 through 15, he stayed in several places: the Zanzibar Motel, the home of his grandmother, Thelma Turner, at 1401 Blue Island, and at the apartment of Sandra Hampton and Lashon Haney at 43rd and South State Street.

Defendant's attention was directed to the late night of March 10 and early morning of March 11 hours. He testified that he saw Marvel at about 2:30 a.m. at 4465 South Lake Park, that he purchased two ounces of PCP and left some cocaine and some cash, that Warren Duncan was outside, that Scott was in the apartment at that time and that when he left both Marvel and Scott were alive and well. He stated he saw Duncan later Monday afternoon. He testified he could not recall but did not think he saw Cornell Murray on Monday afternoon.

Defendant testified he got a room at the Zanzibar Motel for himself and his girlfriend and sold some drugs from that room. He testified he saw a 6 p.m. news flash that two people had been killed "at that address on Lake Park" and it was a drug-related case. On Tuesday, he stayed at the Zanzibar until evening and made several telephone calls. He stated while it was possible he had called Barbara Russell, he did not remember doing so. He stated he believed he stayed at his grandmother's on the night of Tuesday, March 12. On Wednesday, March 13, he went to apartment 201 at 3737 South Federal, Miss Murray's house, then cashed a Public Aid check for $134 at a currency exchange at 75th and King Drive, then to the Palace Pawn Shop, where he redeemed his watch. He next went to 43rd Street, then stopped "back on 39th Street," all the while smoking and getting high. He stated he was not sure but believed he saw "Dennis [sic] Williams" that afternoon.

Defendant testified that in the evening on March 13, he saw Marcus Burruss and Thomas Carter (but did not recall seeing Keith Burruss), that Marcus walked into a first-floor apartment, came out and walked toward the parking lot where he handed something to Carter, which Carter put in his waistband, and walked away. He stated he was not sure if he saw the gun admitted as People's exhibit 17 that evening and that at no time did he, the defendant, have this gun.

Defendant testified that on March 14 he was high on drugs when he went to Jerome Williams' apartment and asked Williams to go with him to court; Marcus Burruss was also at the apartment. Burruss drove, with Williams and defendant as passengers. On the way to court they stopped on 51st Street where Burruss got out "to go take care of some business" while Williams also got out of the car and defendant waited in the car. When shown People's exhibit 16, a watch and a ring, defendant testified that neither of these items was in his possession on March 13 or March 14. Defendant stated that after his court appearance he went to his grandmother's home to

change clothes and learned the police had left a card for him to call them.

On Thursday evening, March 14, defendant stated he went to 43rd and State Streets, where he listened to records, played cards and got high. He stated he did not sleep that night.

Defendant testified that on Friday morning, March 15, he went to the police station with the card the police had left. He stated he gave them an account of where he was during the times related to the killings and told the police he did not do it and had no idea who did it. He stated he was at the police station two or three days, 36 hours, and when he signed the statement he was exhausted and "[j]ust couldn't take it no more." He acknowledged he heard the statement read in court but stated that no part of the statement was true.

On cross-examination defendant could not remember when he last saw Marcus Burruss prior to March 11 and acknowledged that the next time defendant saw him was late Wednesday evening, March 13, when defendant "smoked some sherm" and Burruss snorted cocaine.

Defendant acknowledged he heard about the murder on TV. He denied knowing that the victims were shot with .38 caliber bullets from a .357 caliber gun and denied telling this to Denise Williams or telling her that he shot the victims. Defendant denied having a conversation with Tom Slick about having a gun for sale for $50 and about a meeting at 3737 South Federal. He denied owning a .357 caliber gun. He stated he did not remember talking to Denise Williams at all. He testified his girlfriend, Chris Bridges, was with him at the Zanzibar Motel but he did not remember dates or times.

He acknowledged that he heard the statement read in court, but stated that none of it was true. He stated he did not remember much of what occurred when the statement was prepared because he was high. He testified that the statement was already written up, he signed it and the police took him down to the lockup. He identified his signature and initials on the document.

Defendant testified that as a middle man in drug deals he would make $500 to $600, sometimes less, sometimes more, and would do these deals two or three times a week. He stated he pawned his watch to have a crystal put in it. It was his normal practice when bringing his watch in for repair to pawn it at the same time.

Defendant denied that Marvel owed him money. In the early morning hours of March 11, he left $350 and "half of a sixteenth of cocaine" worth about $80 to $90 on the street. He stated the PCP he purchased was an ounce and a half, that he put a half ounce of "cut" on it to make two ounces, worth on the street about $325 an ounce.

He stated he never did sell to Marvel, that they would exchange because defendant sold cocaine and Marvel sold PCP and each liked what the other had.

Defendant did not remember meeting Cornell Murray on Monday afternoon, March 11, nor showing him PCP nor telling Murray he killed people out south. He stated he knew Denise Williams, Barbara Russell, Jerome Williams and Keith Burruss, but that they are not his friends. He acknowledged that he told the police he had been with Warren Duncan on the morning of March 11. When asked if the police told him Duncan said he was not with defendant that morning, defendant responded that he thought Duncan should be in court to testify. When asked where Duncan was, defendant responded "I am not sure." When asked how he knew where the bodies were in the apartment when he signed his statement, he stated the document was prepared when he signed it and that the assistant State's Attorney talked to the investigating officers before he prepared the statement and that he, the defendant, did not recall telling him anything.

On redirect, defendant testified he was high on drugs on March 10, 11, 12, 13, 14, 15 and 16, including the time he was in the police station.

The State offered no rebuttal.

At the conclusion of the bench trial defendant was convicted of the two murders, armed violence, and felony theft. At the sentencing hearing the court found sufficient mitigation to deny the State's motion for the death penalty. The defendant was sentenced to natural life for the murders on counts I through X and to five years for each of the two felony thefts with the armed violence convictions merged into the murder convictions. The defendant appealed.

Initially the defendant argues that the court erred in denying defendant's motion to quash the arrest and to suppress evidence. In contending that he was under arrest from the time he entered the police station, the defendant cites the judge's statement that "there is no question that this man was under arrest after he arrived at Area 1 violent crimes and was placed in the interview room when that door was locked and that period came shortly after he went there voluntarily."

■■ ■ The defendant arrived at the police station at approximately 9:15 a.m. He came voluntarily. The first interrogation session took place in the open conference room. The mere fact that the questioning took place in a police station is not in and of itself sufficient to convert the questioning into an arrest. (*People v. Longoria* (1983), 117 Ill. App. 3d 241, 250, 452 N.E.2d 1350, 1356.) Numerous factors must

be considered, including "the place of interrogation, any statements or nonverbal conduct indicating the accused is not free to leave, the extent of the knowledge of the police officers and the focus of their investigation, and the intentions of the officers. [Citations.] The court should also look to the time, length, mood and mode of the interrogation, the number of police officers present and the presence or absence of friends or family of the accused, the manner in which the person questioned got to the place of interrogation, whether he was allowed to walk within and from the location of interrogation unaccompanied by police, and age, intelligence, and mental makeup of the accused. [Citations.]" *People v. Smith* (1986), 150 Ill. App. 3d 524, 528, 501 N.E.2d 1010, 1013; see also *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226, 230, *appeal denied* (1982), 91 Ill. 2d 578.

■ The defendant here was 28 years old, had completed three years of high school, and by his own testimony had done "research in the laws." The defendant went to the police station of his own accord, after being told by his family that the police wanted to question him regarding the murders. Unlike a defendant who accompanies police officers to the station, a defendant who goes there of his own free will does not go there under duress. *People v. Wipfler* (1976), 37 Ill. App. 3d 400, 403, 346 N.E.2d 41, 44, *aff'd* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.

■ The defendant argues that the cursory search performed by the officers upon his arrival was an indicia of arrest sufficient to convert the questioning from mere inquiry into arrest. However, the trial judge commented that such a search would be appropriate under the circumstances. The defendant was not booked, fingerprinted, photographed, told he was under arrest, or physically restrained at that point. The defendant admitted that he was not told he was under arrest or that he was not free to leave, and was not handcuffed prior to the police officer's declaration that he was under arrest at 3 p.m. on March 15.

The defendant claims to have been threatened during the first interview, which the detectives deny. The detectives stated that following the initial interview, they asked the defendant if he would be willing to remain in the conference room while they checked his story and he agreed to do so. He was not restrained in any way. The door to the conference room was left open. The police officers testified that upon his arrest at 3 p.m. on March 15, defendant was moved from the open conference room into an interview room where the door was locked. He was not handcuffed.

The defendant emphasizes the court's statement in ruling on the motion to quash the arrest that there is no question that defendant was under arrest shortly after he voluntarily went to the police station. This argument ignores the judge's qualifying statement, that this occurred when he was placed in the interview room where the door was locked. The court also noted that this was an active criminal investigation and that the police had some prior information that the defendant might have been involved.

■■ While the defendant's testimony is in conflict with that of the police officers as to whether defendant was left in a locked room following his first voluntary interview while the police checked his story or whether he was left in the conference room where the door was unlocked, it is for the trier of fact to determine the credibility of witnesses and resolve conflicts in their testimony. (*People v. Clay* (1973), 55 Ill. 2d 501, 504, 304 N.E.2d 280, 283.) The court believed the police officers. When they returned to the police station after checking the defendant's story, the police officers placed him under arrest. The arrest report places the time of arrest at 1500 hours on March 15.

■■ Here, the defendant was arrested without a warrant. The defendant argues that the arrest was also without probable cause, and for these reasons the arrest was illegal and must be quashed. The trial court denied defendant's pretrial motion to quash the arrest. Because this finding is not clearly contrary to the manifest weight of the evidence, it will not be overturned on review. *People v. Creach* (1980), 79 Ill. 2d 96, 102, 402 N.E.2d 228, 231.

The defendant further argues that under the exclusionary rule all evidence obtained as the result of his illegal arrest and his inculpatory statements made while he was in custody are tainted by the illegal arrest and must be suppressed. The trial court denied the defendant's motion to suppress.

■■ The United States Supreme Court in discussing the exclusionary rule defined the purpose of the rule as the protection of the fourth amendment rights of an accused against unreasonable searches and seizures and his fifth amendment guarantee against coerced self-incrimination. (*Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62; see also, *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) The rule is intended to deter lawless conduct by police officers and prohibits the use at trial of unconstitutionally obtained evidence. (*Brown v. Illinois*, 422 U.S. at 599-600, 45 L. Ed. 2d at 425, 95 S. Ct. at 2260.) The court identified the "voluntariness of the statement" as the threshold inquiry in determining admissibility. *Brown v. Illinois*,

422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262.

■■ The *Brown* court identified four factors to be considered in determining whether a statement by an accused was given as an exercise of his free will. They are: (1) the temporal proximity of the allegedly illegal arrest and the statement; (2) the presence of intervening events or circumstances of significance; (3) the purpose and flagrancy of police misconduct, if any, toward the accused; and (4) the presence or absence of *Miranda* warnings. *Brown v. Illinois*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.

■■ In determining the admissibility of defendant's statements we find that the facts of this case clearly meet the test of the four factors of *Brown* and that the court's ruling on the motion to suppress was correct.

We consider first the conduct of the investigating officers from the time of defendant's arrival at the police station until his written statement. The defendant alleges there was police misconduct from the moment he entered the station on March 15 and was searched, then was placed in a small locked room and not offered food, drink, or use of a washroom. The defendant testified that at mid-afternoon on March 15 he was questioned, then left alone again until late that evening when he was given a polygraph test; that he returned to the station and was placed in the lockup for the night, still without food or drink, although he was permitted to use the washroom; that the next day on March 16 he was taken from the lockup to the interview room and repeatedly mentally and physically abused and deprived of sleep, food, use of washroom facilities, and use of a telephone.

The police officers denied any physical or mental abuse of the defendant. They testified that he was given food and drink periodically and that he requested nothing additional. According to the officers, the defendant did not ask to use a telephone, and the defendant used washroom facilities when he needed to use them. When a physical examination was performed on the defendant at the county jail Sunday, March 17, no sign of injury or mistreatment was observed by the intake medical technician nor did defendant complain to him of any mistreatment while in police custody. While the trial judge in ruling on the defendant's motion to suppress was critical of the fact that the police had held the defendant "incommunicado" from early on March 15 until 3 a.m. on March 17, he specifically found the officers' treatment of the defendant, as a whole, was not so egregious as to overbear the defendant's will. We also note that there is no evidence that the defendant complained of the alleged mistreatment when it occurred, or that he mentioned mistreatment by the police at any time

before the motion to quash arrest and suppress statements was made.

Under very similar facts, where a defendant waited over one month to complain of beatings which allegedly induced him to make the contested statement, where the police officers denied that he had been mistreated while in custody, and where an uninvolved witness testified that the day after the alleged beatings the defendant showed no signs of abuse, the court upheld a finding that there had been no abuse. (*People v. Fields* (1975), 31 Ill. App. 3d 458, 468-69, 334 N.E.2d 752, 761.) The court noted that such conflicts in testimony must be resolved by the trier of fact based upon the witness' credibility. *Fields*, 31 Ill. App. 3d at 469, 334 N.E.2d at 761.

The interrogation of the defendant here was not continuous, relentless or abusive. Long periods of time elapsed between the interrogations. None of the questioning sessions was longer than an hour. The interrogation time over the entire 42-hour period did not exceed seven hours in total. The defendant failed to complain of any mistreatment by police or any injury while he was in custody and failed to complain to the polygraph examiner or to the medical intake personnel nor was any injury apparent to the admitting staff when defendant was transferred to the Department of Corrections. His first complaint was made at the time of his motions to quash his arrest and to suppress. The defendant was given food and beverages periodically and allowed to use washroom facilities when necessary. He was placed in the lockup overnight to sleep and was given adequate rest periods during the day.

The court concluded that the confession was not coerced by any overbearing misconduct by the police. We agree.

Next we find that the evidence before the court clearly supports the court's finding that defendant's testimony was not credible where he denied that he was advised of his constitutional rights.

Here, the defendant testified that he was never advised of his constitutional rights as required by *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, until he made his formal statement to the assistant State's Attorney. The State's witnesses all testified that prior to each interrogation and prior to giving his statement the defendant was advised of his *Miranda* rights. The court based its ruling on the credibility of the witnesses and stated that it was convinced that the police followed the prescribed procedure and gave the defendant his constitutional warnings.

Unless the record indicates that such decision is clearly erroneous, it will not be overturned. (*People v. Kashney* (1984), 129 Ill. App. 3d 218, 222-23, 472 N.E.2d 164, 167, *aff'd* (1986), 111 Ill. 2d

454, 490 N.E.2d 688.) When the defendant is admonished of his rights and indicates he understands them, his giving of a statement without requesting a lawyer is evidence that he has chosen to waive a known right. *People v. Martin* (1984), 102 Ill. 2d 412, 425, 466 N.E.2d 228, 234.

██ The trial court here found that the police followed all prescribed procedures to inform the defendant of his constitutional rights to counsel, and advised him that he was not required to make a statement against his self interest. The court found that the defendant understood those warnings and that he voluntarily gave up those rights when he made an oral statement, and then signed a written statement, both to the assistant State's Attorney. The court concluded that defendant's confession was freely given and not coerced.

We next consider the time elapsed from defendant's arrest to the oral and written statements of his guilt. Temporally, the statement was far removed from the time the defendant entered the police station. The defendant arrived at the station at approximately 9:15 on the morning of Friday, March 15, and it was not until the late evening hours of Saturday, March 16 and the early morning hours of Sunday, March 17, that he made his statement to the assistant State's Attorney, in which he confessed to the murders. More than 40 hours had elapsed between his arrival and his statement. Approximately 34 hours had passed from his arrest at 3 p.m. on March 15 to the time of his incriminating statement.

██ The length of time between arrest and statement can serve to dissipate any taint an illegal arrest might have upon the defendant's statement, or it may exacerbate the already coercive nature of the defendant's detention. *People v. Lekas* (1987), 155 Ill. App. 3d 391, 414, 508 N.E.2d 221, 237.

We find the record adequately supports the conclusion that the lapse of time from initial custody until the defendant's incriminating statement, when considered together with intervening events and circumstances of significance, establishes the attenuation described in *Brown* and in turn removes the taint from the statement which might otherwise be inadmissible.

The record established that defendant was interrogated by the police at the station at seven different times for periods ranging in length from 15 minutes to one hour. However, the record also reflects that between these interrogations the defendant was given long periods of time alone to reflect on the investigation and on the police report to him that his initial story was contradicted by the persons he obviously believed would corroborate his version of the events of

March 11. As the investigation was developed, he had time to consider the case against him and any options available to him. He was aware that he had failed the polygraph examination.

■■ Where a defendant has been left alone for long periods of time, where the defendant's testimony conflicts with that of others and with information known to the police officers, and where new information is discovered between a defendant's arrest and statement, the courts have found sufficient attenuation to dissipate any taint of illegal arrest. *Lekas*, 155 Ill. App. 3d at 414, 508 N.E.2d at 237; *In re R.S.* (1981), 93 Ill. App. 3d 941, 946, 418 N.E.2d 195, 199; *People v. Finch* (1980), 86 Ill. App. 3d 493, 497, 408 N.E.2d 87, 90.

■■ It is clear from the record, and even from the chronology presented by the defendant in his appellate brief, that he was not subjected to "relentless interrogation" during the period he was in custody at the station, but was questioned seven times by detectives for a total of less than seven hours, by the polygraph examiner for approximately one hour, and by an assistant State's Attorney when the defendant made his final oral and written statements. The 10 scattered interrogations totalled less than one-quarter of the time the defendant was at the police station. This was not a relentless, coercive interrogation which could have overborne the defendant's will.

On the record before us, we find that the defendant's inculpatory statement was sufficiently attenuated from his arrest that it was not tainted by a purported illegal arrest and that its admission at trial was proper.

The defendant testified that he had spent the night before he went to the police station drinking cognac and "snorting" cocaine, and that he smoked two PCP cigarettes while in custody. He argues that his statement was not freely made and should have been suppressed because he was under the influence of drugs and alcohol when he made his inculpatory statements to the assistant State's Attorney.

The State's witnesses testified that the defendant did not appear to be under the influence of drugs and that they detected no scent of narcotics in the rooms where the defendant claimed to have smoked the cigarettes. The polygraph examiner testified that while the defendant told him that he had ingested beer, cognac, PCP and cocaine within the preceding 24 hours, the defendant also told the examiner that he had slept the night before and "felt okay" and "was straight" and not under the influence of any drugs at the time of the examination. When the defendant was given a medical screening on his admission to jail, he stated to the intake worker that he did not use drugs.

■■■ ■ A person's statement will be suppressed on the ground of intoxication or drug use only if when the statement was made the person was so grossly intoxicated as to be incapacitated. (*People v. Moon* (1976), 38 Ill. App. 3d 854, 860, 350 N.E.2d 179, 183.) Lesser degrees of intoxication or drug use go merely to the weight to be given to the confession. (*People v. Andersen* (1985), 134 Ill. App. 3d 80, 95, 479 N.E.2d 1164, 1174-75.) Here, the record does not support a finding that the defendant was incapacitated by the amount of drugs he had taken. No expert testimony was offered that the combination of drugs the defendant claimed to have taken would have incapacitated him when he gave his confession to the assistant State's Attorney. (*People v. Koesterer* (1976), 44 Ill. App. 3d 468, 476-77, 358 N.E.2d 295, 304.) Because the record does not reflect any drug- or alcohol-related incapacity, the court properly refused to suppress his statement on this ground.

■■■ In his reply brief, the defendant contends for the first time that he should have been taken before a judge earlier than Monday, March 18, for arraignment. Because this issue was not raised at trial or in post-trial motion, we find the issue waived on appeal. Were we to consider the question on appeal we would find no error. While the State is required once an accused is arrested to present him before the court for arraignment without unnecessary delay, where the time elapsed between arrest and arraignment includes a Saturday and Sunday or a court holiday, the delay was not unnecessarily long nor did it prejudice the defendant. *People v. Dove* (1986), 147 Ill. App. 3d 659, 667, 498 N.E.2d 279, 284-85.

■■■ In ruling against defendant's motion to suppress, the court found that although defendant was detained for many hours there was an active investigation in progress. The defendant's statement was made at about 2:30 a.m. on March 17. He was given food and then taken to the lockup for the night. When defendant was transferred to the Department of Corrections on Sunday afternoon, March 17, the transfer followed a reasonable period of time for defendant to rest and sleep following a 14-hour day. The intake process at the jail was completed late in the day on March 17. Clearly, presenting the defendant for arraignment on the next court date, Monday, March 18, was not an unreasonable delay.

■■■ We next consider defendant's argument that his conviction for felony theft was error and should be reduced to misdemeanor theft. He contends that the evidence failed to prove that the value of the items taken exceeded $50. The Illinois Criminal Code, at section 16—1(e), states:

"(1) Theft of property, other than a firearm, not from the person and not exceeding $300 in value is a Class A misdemeanor. ***

(2) Theft of a firearm not from the person regardless of value is a Class 4 felony. ***

(3) Theft of property from the person or exceeding $300 is a Class 3 felony." Ill. Rev. Stat. 1985, ch. 38, par. 16–1.

In his written statement on March 17, admitted into evidence at trial without objection, defendant stated that he took 2½ ounces of PCP, a .32 caliber gun, two rings, "his watch" and about $250 in U.S. currency from the victims' residence. He stated that he pawned the watch and that he gave "the ring" and his .357 caliber revolver to a friend. He also stated that he gave the .32 caliber gun and the PCP to his cousin and that he told her to "sell the PCP for six hundred dollars and to give him back four hundred dollars."

A prosecution witness, Thomas Carter, testified that on March 13, the defendant sold him a .357 caliber gun for $50 and identified the .357 caliber gun in evidence as the weapon he purchased. Dennis Marvel, son of one of the victims, identified a Seiko watch and a diamond ring in evidence as his father's jewelry. No evidence of the value of these items was offered.

Denise Williams testified that on March 12, defendant told her he took some jewelry from the victims' home on the day of the murders. Keith Burruss identified the ring, in evidence as People's exhibit 16, as the ring defendant was wearing on March 13, but stated he was not familiar with the watch in evidence. Jerome Williams testified that on March 14, when he and Marcus Burruss drove defendant to court, the defendant had some jewelry, a ring and a watch, to pawn and that they stopped at United Loan Company, where Burruss went into the shop then came out with a pawn slip which he kept. Detective Evans testified that he got the pawn ticket from Marcus Burruss and on March 17, with the ticket, he retrieved the ring and watch in evidence and identified as Marvel's jewelry by the victim's son, from United Loan Company. Defendant's statement acknowledges he took two rings and a wristwatch from the homicide scene, that the watch was pawned and that a ring and the .357 caliber gun were given to a friend.

The defendant argues that without proof of the actual fair cash market value of these items, the theft is merely a misdemeanor. (*People v. Brown* (1976), 36 Ill. App. 3d 416, 420-21, 343 N.E.2d 700, 703.) But, the Illinois Supreme Court has held that a court may take judicial notice of the fact that, while the actual value of an item re-

mains unproven, the object is worth more than the statutory minimum. *People v. Tassone* (1968), 41 Ill. 2d 7, 12, 241 N.E.2d 419, 422-23.

■■■ The trial court found the evidence was sufficient to establish that the value of the stolen property exceeded $300. We find defendant's conviction of felony theft is supported by the evidence and that defendant's argument that the conviction should be reduced to misdemeanor theft is without foundation on this record. We find no error.

The defendant next argues that the trial judge made certain erroneous rulings which violated his constitutional right to a fair trial.

First, defendant argues that it was prejudicial error for the trial court to admit police officer Redmond's hearsay testimony about Warren Duncan's out-of-court statements to him which contradicted defendant's initial in-custody statement regarding his actions on the day of the murders. Duncan did not testify at trial nor did he testify at the pretrial hearing on defendant's motion to suppress.

■■■ Hearsay testimony in court of a statement made out-of-court and which is offered to show the truth of the matter asserted is inadmissible because the party against whom it is offered is deprived of the opportunity to cross-examine the declarer to test its validity. *People v. Parrott* (1976), 40 Ill. App. 3d 328, 330, 352 N.E.2d 299, 302.

Detective Redmond testified about his participation in the police investigation of the homicides. When defendant appeared at the police station and after being given his *Miranda* warnings, he was interrogated about his activities on March 11, the day of the murders. The defendant admitted being at the victims' apartment that day stating that he had gone there at 2 or 3 a.m. with Duncan. Defendant was asked to wait at the police station while the officers checked his story. Redmond testified that when he returned to the station he advised the defendant that Duncan told him he was not at the apartment that morning. Defendant responded that Duncan was mistaken.

Defense counsel objected to Redmond's testimony regarding Duncan's statement. The trial court initially overruled the objection, then sustained and again overruled, when Redmond testified he was recounting Duncan's statement to defendant during the second interrogation.

■■■ Redmond's testimony merely related his conversation with the defendant after he spoke with Duncan and returned to the station. We find that this evidence was properly admitted by the trial court. Redmond did not testify to the substantive truth of Duncan's statement, but testified under oath only to the fact that he told defendant that Duncan had not corroborated defendant's initial story.

This evidence was entirely within Redmond's personal knowledge and was not hearsay. (*People v. Houston* (1974), 21 Ill. App. 3d 209, 213-14, 315 N.E.2d 192, 196.) Even if this statement were to be construed as hearsay, evidence of a hearsay statement made to a police officer will not affect the validity of a conviction where the evidence could not have changed the outcome of the trial. (*People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.) Here, defendant was tried by the court, and the evidence that defendant shot the victims was overwhelming. No reversible error occurred.

It is clear from the record that the testimony was being offered to describe the process and development of the investigation and the subsequent interrogations of the defendant while he was in custody. Because it was not offered for the truth of the matter asserted, the testimony is not inadmissible hearsay and its admission was not prejudicial error. *People v. Jones* (1983), 114 Ill. App. 3d 576, 589, 449 N.E.2d 547, 557-58.

Second, the defendant argues that the trial court prejudicially restricted defense cross-examination of State's witness Barbara Russell. The cases cited by the defendant support our conclusion that the trial judge did not inappropriately curtail cross-examination of this witness. The complete colloquy at issue is as follows:

"Q. [by Defense Attorney]: Now Ms. Russell, you knew Lorenzo and Ninette very well, didn't you?

A. Yes, I did.

Q. And you were very close to them, weren't you?

A. Yes, I was.

Q. In fact, you knew that Lorenzo dealt drugs with a lot of people, didn't you?

A. I couldn't—I would say yes, I guess so.

Q. I am sorry. Would you speak up, please?

A. I guess, yes.

Q. And you knew that Lorenzo always dealt drugs in the kitchen, is that correct?

A. Not necessarily. I knew that he had dealt drugs, I mean some transactions were made in that area.

Q. And you know he kept the drugs in the kitchen?

THE COURT: Oh, come on. She already said she knew he dealt drugs. Get into whatever you want to get into.

Q. [by Defense Attorney]: Now, you were very upset when you heard that Lorenzo and Ninette had been killed, weren't you?

A. Yes, I was."

■■■ There is no indication in Russell's testimony of the "biases, prejudices and motives" of which the defendant accuses her, nor is there anything in the defendant's brief to indicate that her testimony was unreliable. (*Davis v. Alaska* (1974), 415 U.S. 305, 318, 39 L. Ed. 2d 347, 355, 94 S. Ct. 1105, 1111.) The trial court has broad discretion to curtail questioning which it finds unnecessarily repetitive or unduly harassing. (*People v. Triplett* (1985), 108 Ill. 2d 463, 475, 485 N.E.2d 9, 15.) We find no error in the trial judge's ruling.

■■■ Third, the defendant argues that because witness Denise Williams' grand jury testimony was used to corroborate her testimony at trial, he was denied a fair trial. A prior out-of-court statement may not be used to bolster a witness' in-court testimony. (*People v. Tidwell* (1980), 88 Ill. App. 3d 808, 810, 410 N.E.2d 1163, 1165.) The relevant portion of the colloquy follows:

"Q. [by State's Attorney]: What do you remember the defendant telling you after you greeted each other?

A. He said something to the fact—something about some m----- f----- that he did something with. That he had—he said that he got rid of them m----- f-----. He was okay now. Something to that effect.

Q. Ms. Williams, do you remember on March 18th of 1985 testifying before the Cook County Grand Jury?

A. Yes, I do.

Q. And you testified under oath, is that correct?

A. Yes, I did.

Q. At that time?

A. Yes, I did.

Q. And do you remember telling the Grand Jury regarding [the defendant], he came in, he came directly to me. He said, 'Hey, cuz, how you doing?' I said, 'Fine.' He said, 'I got those two m----- f-----. I am all right now.'

[Defense attorney]: Objection. Not impeaching.

THE COURT: Overruled.

Q. [by State's Attorney]: Ms. Williams?

THE WITNESS: Right, that's what I said. I couldn't say exactly."

■■■ At trial the defense objected on the basis of a failed attempt to impeach. On appeal, however, the defendant does not raise the failure to impeach argument but instead argues that admission of this testimony about a prior out-of-court statement by the witness which was consistent with her trial testimony was error. *People v. Powell* (1973), 53 Ill. 2d 460, 292 N.E.2d 409, and *People v. Clark* (1972), 52

Ill. 2d 374, 288 N.E.2d 363, hold that a witness may not testify to out-of-court statements which harmonize with or corroborate his testimony given at trial. By his failure to preserve this argument in the trial court, the defendant has waived it.

■■■ Even if the defendant had not waived this argument, we find that the admission of the witness' testimony of her prior consistent statement was harmless error here. The fact that Williams expressed uncertainty in her recollection of the exact words the defendant had said to her caused the State to refer to her prior grand jury testimony to clarify her answer. This witness gave substantial testimony about her conversation with defendant, and admissions he had made to her. Her testimony to the grand jury did not differ from, nor was it intended to bolster or corroborate, her trial testimony.

■■■ A witness may not testify to out-of-court statements which the witness made in order to bolster or corroborate the witness' in-court testimony. (*People v. Davis* (1984), 130 Ill. App. 3d 41, 54, 473 N.E.2d 387, 397.) Only if the witness has no memory concerning the facts or incident in question may the witness' memory be refreshed. (*Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 184, 485 N.E.2d 855, 865.) Williams was uncertain in her recollection of the exact words the defendant had said to her which caused the State to refer to her prior grand jury testimony to clarify her answer. While the defense objected on the basis of a failed attempt to impeach, we find that the question was intended to refresh her recollection of defendant's exact words to her. Because the witness gave substantial other testimony regarding what the defendant told her, we find the challenged testimony is cumulative. (*People v. James* (1981), 100 Ill. App. 3d 884, 890, 427 N.E.2d 248, 253.) We see no inconsistency between the testimony "he said that he got rid of them m----- f------" and "I got those two m----- f------." We find no error here.

Fourth, the defendant argues that error occurred when he was asked twice on cross-examination whether the witnesses who testified against him fabricated their testimony.

During cross-examination, the defendant was asked "[a]ll those people who came in here and testified that you told them you killed those two people; you had gotten them; they are making that up? *** They are all making that up?" He responded "[w]hen you say all the people, who are you speaking of?" The court overruled defense counsel's objections. Shortly thereafter, the defendant was asked "[s]o what you're saying is that the Assistant State's Attorney went out and made these facts up and came in and you decided you wanted to change some things?" to which he responded "I didn't say he made it

up." No objection was made by defense counsel to this question.

■■■ Where defendant is asked repeatedly whether the witnesses for the State lied in their testimony against him, this line of inquiry is improper because the questions invaded the province of the trier of fact, who is charged with determining witness credibility (*People v. Riley* (1978), 63 Ill. App. 3d 176, 185, 379 N.E.2d 746, 753) and, in a bench trial, with the determination of the guilt or innocence of the defendant.

■■■ Here there was substantial evidence to convict the defendant. Considering all of the evidence produced, clearly any error in permitting this questioning would be *de minimis*. (*People v. Meeks* (1973), 11 Ill. App. 3d 973, 980, 297 N.E.2d 705, 710-11; *People v. Velillari* (1980), 84 Ill. App. 3d 333, 342, 405 N.E.2d 466, 472-73.) This was a bench trial before a judge with many years of criminal trial experience. He is presumed to have considered only competent evidence. (*People v. Meier* (1975), 30 Ill. App. 3d 1, 7, 332 N.E.2d 1, 5.) Where, as here, the questions are asked to test the credibility of the defendant's testimony, we believe them to be proper cross-examination and for that reason we do not find them to be error.

The defendant cites as a fifth erroneous ruling by the trial judge his failure to recuse himself because he knew one of the State's witnesses personally. The record discloses, however, that the judge also knew one of the defendant's witnesses. As each of these witnesses was called, the judge made statements on the record that he was acquainted with them.

When Brenda Russell was sworn as a State's witness, Judge Strayhorn stated that "[j]ust so the record is straight, the record should reflect that the Court knows the parents, or has known this young lady since she was a small child." Later, when Excell Jones was sworn as a defense witness, the judge stated "[t]he record should indicate that the Court knows this witness, also." The defendant did not object or move for a new judge when these disclosures were made. On appeal, defendant cites as a basis for his reversal only the judge's acquaintance with the State's witness Russell and fails to raise any objection to his acquaintance with defense witness Jones.

■■■ ■ Illinois Supreme Court rules require a judge to follow the highest standards of conduct, avoiding even the appearance of impropriety. (107 Ill. 2d R. 61.) He is required to recuse himself only if a person within three degrees of kinship "is a party, has an interest, or appears as counsel." (107 Ill. 2d R. 63.) Defendant does not argue that the judge was related within three degrees of kinship to witness Russell. We find that the trial judge was not required to recuse him-

self and that his disclosures on the record that he knew two of the witnesses was a more than adequate response to defendant's tardy objection on appeal, and that the judge complied fully with the requirements of the rules of judicial conduct prescribed by the court. We find no error.

We next consider the defendant's argument that the imposition of the mandatory sentence of natural life without consideration of factors in mitigation violates the eighth and fourteenth amendments to the United States Constitution. The defendant challenges the constitutionality of section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)), which provides in pertinent part:

"A sentence of imprisonment for a felony shall be a determinative sentence set by the court under this Section, according to the following limitations:

(1) for murder, *** (c) if the defendant has previously been convicted *** or is found guilty of murdering more than one victim, the court shall sentence the defendant to a term of natural life imprisonment."

The defendant argues that a sentence of natural life imprisonment with no possibility of parole is equivalent to a death sentence. Defendant adopts the rationale of those cases which hold that the death penalty is so severe a penalty that mitigating factors must be considered before sentence is imposed. *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954; *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001.

This court has previously discussed whether the statute's mandatory and nondiscretionary provisions constitute cruel and unusual punishment because a consideration of mitigating factors is not required. (*People v. Boswell* (1985), 132 Ill. App. 3d 52, 61-62, 476 N.E.2d 1154, 1161.) The court in *Boswell* rejected the argument that the statute is unconstitutional in reliance on *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059.

In *Taylor* the supreme court found that it is the province of the legislature to define criminal conduct and the nature of punishment to be imposed unless the statute is in clear violation of constitutional rights. The *Taylor* court found that "[t]he rehabilitative objective of [the constitution] should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more

murders. \*\*\* We cannot say that the penalty called for in section 5—8—1(a)(1)(c) violates [the constitution]." *Taylor*, 102 Ill. 2d at 206, 464 N.E.2d at 1062.

■■ On the record, it is clear that prior to sentencing a full hearing was had on the question of mitigating factors. The court found that as a mitigating factor "the fact that prior to this event there is no indication of any significant history on behalf of Mr. Matthews, outweighs the aggravating fact of the multiple deaths to the extent the Court would not impose the death penalty as punishment in this case." Section 9—1(b)(3) of the Illinois Criminal Code of 1961 permits the court to consider the death penalty as a possible sentence for this defendant under these facts. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3).) The court considered factors in aggravation and mitigation and sentenced the defendant to natural life under chapter V of the Unified Code of Corrections as required by section 9—1(h). (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h).) We find no violation of defendant's constitutional rights in the sentence imposed.

■■ The defendant argues that he should have been sentenced under the permissive portion of the statute (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)) instead of the mandatory portion (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)). However, in a decision handed down over five months before defendant's brief was filed for this appeal, the Illinois Supreme Court specifically addressed this question and held that a judge's only discretion in a case involving conviction for multiple homicides is whether or not to impose the death penalty. If he chooses not to impose the death penalty, the judge must follow the statute, which "unequivocally mandates natural life imprisonment for the murder of two or more persons." (*People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 336, 518 N.E.2d 1047, 1050.) The defendant in that case was convicted of multiple murders. The trial judge exercised his sentencing discretion and refused to impose the death penalty. The supreme court found that he then had no further discretion in sentencing to exercise and that the statute mandated a sentence of natural life for the murder of two or more persons. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c). See also *People v. Clark* (1987), 119 Ill. 2d 1, 5, 518 N.E.2d 138, 140.

■■ Here, the defendant was convicted of murdering two people. Having found mitigating circumstances which permitted the judge to reject the death penalty, we find he had no further discretion to exercise. He was required to sentence the defendant under the mandatory natural life sentence prescribed for one convicted of multiple murders.

Finally, the defendant argues, and the State agrees, that the mittimus must be corrected. The order of sentence and commitment recites judgments entered on counts I through X, which are the murder counts. Because the felony-murder counts in counts V through X are predicated on the underlying charges of armed robbery, residential burglary and home invasion, these convictions must be vacated and the mittimus corrected. The State agrees that the murder convictions on counts III and IV should be merged with the convictions on counts I and II. Because two murders were committed, defendant argues that he cannot be convicted of more than one offense arising out of the same physical act and that judgment of conviction and sentence are appropriate only on counts I and II and that judgments on counts III and IV should be vacated. We find that murder convictions and sentence on counts V through X of the felony murder counts was error.

■ Because this court has the authority to make any order that ought to have been made by the trial court, including correction of the mittimus, we do so order that the written order of sentence and commitment is corrected to show defendant's conviction for murder on counts I and II, and that convictions for murder on counts III and IV are merged into counts I and II, and that convictions for murder on counts V through X are vacated. We affirm all other provisions of the written order of sentence and commitment and direct the clerk of the court to correct the mittimus in accordance with this order.

For all of the foregoing reasons the judgment of the circuit court is affirmed and mittimus corrected.

Judgement affirmed and mittimus corrected.

McNAMARA and EGAN, JJ., concur.