THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALAN KAYE, Defendant-Appellant.

First District (1st Division)    No. 1—92—3730

Opinion filed May 31, 1994.—Rehearing denied July 22, 1994.

William E. Reynolds, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Jon J. Walters, and James Ryan, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, defendant, Alan Kaye a/k/a Alan Kirschner, was found guilty on 13 counts of automobile-related theft (Ill. Rev. Stat. 1989, ch. 95$^1$/2, pars. 4—103(a)(1), (a)(2), (a)(4)), and one count of theft of vehicle property by deception (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a)(2)(A)), and sentenced to seven years' imprisonment. On appeal, defendant contends that: (1) the State failed to prove him guilty of the offenses charged beyond a reasonable doubt; (2) the trial court improperly considered evidence outside of the record; (3) the trial court improperly permitted testimony regarding his prior felony conviction; (4) the trial court improperly permitted a police officer to testify corroborating the out-of-court statements of a prosecution witness; and (5) the trial court erred in denying

defendant's post-trial motion to bar admission of his prior felony conviction during sentencing proceedings. For the following reasons, we affirm the judgment of the trial court.

## BACKGROUND

The record reveals the following relevant facts. Defendant was charged by indictment with the following violations of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95$^1$/$_2$, par. 4—100 *et seq.*): knowingly possessing a stolen 1989 Jaguar; knowingly possessing the 1989 Jaguar with a falsified vehicle identification number (VIN); knowingly possessing the 1989 Jaguar with a removed VIN; knowingly falsifying the VIN on the 1989 Jaguar; knowingly removing the VIN on the 1989 Jaguar; knowingly possessing a stolen 1988 Mercedes; knowingly possessing the 1988 Mercedes with a falsified VIN; knowingly selling the 1988 Mercedes with a falsified VIN; knowingly possessing a stolen 1988 Mercedes with a removed VIN; knowingly removing the VIN on the 1988 Mercedes; knowingly falsifying the VIN on the 1988 Mercedes; knowingly obtaining by deception and theft the property of Jerome Purze; knowingly possessing a stolen 1974 Mercedes; and knowingly possessing a 1974 Mercedes with a falsified VIN.

At trial, Kevin Ebel testified as a witness on behalf of the State that he owns three Ace Hardware stores in Oak Forest, Illinois. Ebel met defendant in early December 1990, through his hairdresser, David Hanson, at Hanson's hair salon in downtown Chicago. Hanson knew that Ebel was looking to buy a car and suggested that defendant could get a car for Ebel. Defendant told Ebel that he was in the business of selling repossessed cars and that he could get great deals because a buyer only had to pay the balance due on the car. Defendant had for sale a 1989 Jaguar XJ6 and suggested that Ebel test drive the car around the block. Defendant stated that the price of the car was $23,900. Ebel told defendant that he was interested, but would have to think about it.

The next day, defendant brought the Jaguar to Ebel's Oak Forest store, accompanied by a tall man with long hair, wearing a leather jacket and cowboy boots. Defendant told Ebel that the man was the mechanic who took care of the car. Ebel had asked his friend, James Wolff, an auto mechanic at a high-end auto dealership, to inspect the car to make sure it was mechanically sound.

Wolff carefully inspected the Jaguar. Then Wolff, Ebel and defendant went for a ride in the Jaguar. Ebel noticed that the serial number tag on the windshield was broken off and asked defendant about it. Defendant said that the tag had broken off when the wind-

shield was replaced. Defendant told Ebel that he could have another tag put on. Ebel asked about the title to the Jaguar, and defendant said he could fax the title to Ebel. Ebel received the title the next day, but stated that the numbers were obscured and illegible.

Ebel called the Oak Forest police, who referred Ebel to the State Police. The next day, Ebel gave the State Police the title papers, and the police told Ebel they would get back to him. Defendant then called Ebel and asked him if he was still interested in the car. Ebel told defendant that he was checking to see if he could get the money. Ebel informed the State Police that defendant had contacted him again, and the State Police told Ebel to set up to buy the car so they could investigate.

Ebel contacted defendant and told him that he wanted to buy the Jaguar. Ebel told defendant to meet him at his bank on Wednesday, knowing that the bank would be closed. On Wednesday, Ebel stopped to see the State Police and identified a photograph of defendant. Ebel did not meet defendant at the bank as planned.

On cross-examination, Ebel agreed that he had no reason to believe the Jaguar was stolen at the time he test drove the car from the hair salon. He stated that he now knew the individual who accompanied defendant to be Charles Gross. After Ebel agreed to purchase the Jaguar, defendant told Ebel to make out two checks, one in the amount of $13,500 payable to Tag's Auto Sales, and the other in the amount of $10,000 payable to Charles Michaels, but Ebel never drafted the checks.

On redirect examination, Ebel was shown a copy of the title to the Jaguar and recalled that he was shocked when he first saw that the car had a Florida title.

Next, James Wolff testified on behalf of the State. Wolff owns a used car dealership in Crestwood, Illinois. On or around December 16, 1990, Wolff met Ebel at his hardware store in Oak Forest to look at a Jaguar Ebel was considering purchasing. At that time, Wolff met defendant. Wolff's cosmetic inspection of the Jaguar revealed the ID tags were missing on all of the body panels, and the ID tag inside the driver's door was not the correct manufacturer's tag. Wolff noted that the tag was in the wrong place and was not the proper shape nor made of the proper material. Wolff also noticed that the body of the Jaguar had been painted. Wolff brought these matters to Ebel's attention. Wolff stated that defendant did not confer with the other man (Gross) in order to answer Ebel's questions.

On cross-examination, Wolff stated that he has been in the business of purchasing and selling used cars for 17 years, and knows how to determine whether cars have been repainted or have had

structural damage not apparent to the unsophisticated eye. Wolff agreed that an ordinary citizen would not have the expertise that he has, to know where to look for various stickers and identifying numbers on a vehicle.

Next, Jerome Purze testified that he met defendant in early November 1990 at his office building, through a dentist, Dr. Goodman. Defendant told Purze that he had repossessed cars that could be bought cheap because there was only a balance left to be paid. Defendant stated that he had a 1988 Mercedes 300E for sale for $23,500. Purze told defendant that he wanted to pay less, but would like to see the car first.

A few days later, defendant brought the Mercedes to Purze's office in Chicago. Purze noticed that the car was very clean and told defendant that he was willing to pay $20,000 or $21,000. Within a day or two, defendant called Purze and said he could buy the car for the reduced price, and Purze agreed. Purze said he would pay for the car upon delivery. Within a week, defendant delivered the Mercedes to Purze at his office, and Purze presented defendant with two cashier's checks as payment, one in the amount of $17,500 payable to Tag's Auto Sales and the other in the amount of $3,500 payable to defendant.

Purze received the title to the car in the mail at the end of the month. Purze then had further discussions with defendant concerning a 1987 Mercedes. Purze asked defendant, "Is it as clean as this car?" and defendant told Purze that the car was clean, but that it was not repossessed as of yet. Defendant told Purze that if he wanted to buy the 1987 Mercedes, he would have to pay defendant up front. Purze agreed and paid defendant by check. Per defendant's instructions, Purze made out two separate checks payable to Tag's Auto Sales in the amounts of $7,000 and $7,500. Purze made out a third check payable to C. Michaels for $5,500. Purze testified that he never received the 1987 Mercedes, nor did he get his money back from defendant.

On January 24, 1991, Purze was contacted by the police. Purze showed the police his 1988 Mercedes, and the police confiscated the Mercedes. Defendant never told Purze that either the 1988 Mercedes or the 1987 Mercedes was a stolen car.

Debra Laiss testified on behalf of the State that she met Charles Gross in January 1990 and dated him for approximately eight months. Laiss met defendant through Gross. In March or April 1990, Gross asked Laiss to put the title to a 1974 Mercedes 450SL in her name. Gross told Laiss that because he was on a work-release program from prison, he was not permitted to have a car registered in his own name. When Laiss severed the relationship in August or

September 1990, she asked Gross if he had taken her name off the title to the car and Gross said that he had done so.

Laiss stated that on January 3, 1991, she received a telephone call at work from Chicago Police Detective Miller. Laiss went to the Chicago police station, auto theft division, at Miller's request, and at that time saw defendant in a room along with several police officers. Defendant pointed his finger at Laiss and told the police that Laiss sold him a 1974 Mercedes 450SL. Laiss responded that she did not sell defendant the car and stated that defendant was lying. At that point defendant put his head down and did not look at Laiss again.

The police asked defendant if he had paid Laiss for the car, and defendant responded that he paid Gross for the car. Laiss stated that she never owned the car that Gross put in her name and that she never had any business dealings with defendant.

On cross-examination, Laiss admitted that she signed the title to the 1974 Mercedes under the heading "Assignment of Title," but stated that the date of sale as it appeared could not have been November 1990, because she stopped dating Gross in August or September 1990. She stated that Gross never told her that the car was stolen.

Next, Illinois State Police Officer George Fitzgerald testified on behalf of the State that on December 17 and 18, 1990, he had telephone conversations with Ebel. At noon on December 19, 1990, Officer Fitzgerald went to Palos Bank in Palos Heights along with five other Illinois State Police agents. At that time Officer Fitzgerald saw defendant sitting in the passenger seat of a black Cadillac parked next to a gray Jaguar. Gross was sitting in the driver's seat. After a few minutes, defendant got out of the Cadillac, entered the bank, exited the bank and returned to the Cadillac. After a few minutes, defendant and Gross exited the Cadillac and approached the back of the Jaguar. Defendant opened the trunk, and Gross removed a license plate and began to attach the plate to the back of the Jaguar. At that point, Fitzgerald and the other officers approached defendant and Gross and identified themselves.

Officer Fitzgerald looked at the front of the Jaguar and noticed that there was no VIN. He asked defendant what he was doing with the Jaguar. Defendant responded that he was going to "broker" the car for Gross. Defendant stated that the car did not belong to him, and that he did not know who it belonged to, but that for his services he was going to receive $4,000. The officers escorted defendant and Gross back to State Police headquarters in Crestwood.

Officer Fitzgerald conducted an examination of the Jaguar. He checked for the confidential VIN located under the hood, and

contacted the National Automobile Theft Bureau to obtain the VIN that corresponds to the confidential VIN. Officer Fitzgerald noted that the Federal safety sticker was not the original, because the material was flat rather than shiny, and the numbers appeared to have been typed by a typewriter. Officer Fitzgerald stated that on December 19, 1990, he received from Ebel a facsimile copy of a Florida salvage title for a Jaguar.

Officer Fitzgerald inspected the Cadillac and recovered a bag containing six blank Federal safety standard stickers for Jaguars and a list of four salvage vehicles purchased from Tag's Auto Sales. He also recovered a window sticker from a 1990 Corvette. He checked the VIN of the Corvette and found it to be a stolen car.

Officer Fitzgerald talked to defendant at approximately 12:45 p.m. Trooper Zadnick informed defendant of his *Miranda* rights, and then left the room. Defendant told Officer Fitzgerald that he had met Gross while they were both in jail. Defendant stated that he knew that Gross was imprisoned for auto-related crimes. Defendant repeated that he was just a broker for Gross, that the car did not belong to him, and that he was going to receive $4,000. Defendant stated that he did not know who removed the public VIN tag. Defendant stated that he did not know that the vehicle was stolen and that he had not attempted to sell any other cars for Gross.

Officer Fitzgerald also interviewed Gross. On cross-examination, Officer Fitzgerald admitted that he was aware of Gross' auto theft background. He stated that Gross admitted to arranging to have the Jaguar stolen and to removing the VIN. The officer agreed that Gross was not charged with any crime and was allowed to leave the police station that day because Gross had agreed to cooperate with the State Police in revealing insurance frauds and information on other stolen vehicles.

Officer Fitzgerald stated that Gross failed to meet the officers as planned at a specified location on December 26, 1990, and had, in fact, fled the jurisdiction. Shortly thereafter, the officer received from Gross a package containing Federal safety standard stickers, blank VIN tags, some body plates and some keys from vehicles. Officer Fitzgerald next saw Gross in 1992 when Gross was in custody in the Cook County jail.

In answer to a question posed by the court, Officer Fitzgerald agreed that he does not have any personal knowledge of any facts through his independent investigation which are contrary to what Gross told him when he interviewed him. He stated that Gross was later arrested in Texas for auto theft.

Chicago Police Detective Frederick Schulz testified that on

December 19, 1990, he interviewed Gross at the headquarters of the Illinois State Police in Crestwood. Based on his conversation with Gross, on January 3, 1991, Schulz and his partner, John Miller, went to the ground level parking garage at the McClurg Court Apartments located at 600 West McClurg Court, Chicago, and spoke to Mr. Alva, a garage manager. Subsequently Schulz located a 1974 white Mercedes with the license tag "TIX." He looked at the VIN tag in the window, then opened the driver's door and found a metal Federal sticker with the same number. Then Detective Schulz looked under the seats and found a line-up tape bearing a different serial number. Meanwhile, Miller had gone to an apartment to locate defendant. Miller returned to the garage with defendant, and defendant stated that he owned the 1974 Mercedes in question.

Detective Schulz investigated the TIX license plate and found it registered to Chicago Concessions under defendant's signature. He located the confidential VIN on the top of the radiator cross member, which at the time was completely covered with primer paint, bondo and white paint.

Detective Schulz had several conversations with defendant on January 3, 1991. While they were in the garage, at approximately 10:30 a.m., defendant told the officers that it was his car and he had had some mechanical work done on it. At the pound, defendant told the officers that he paid $5,000 for the car. The officers took defendant to the police station around noon. At that time, defendant told Officer Miller that he bought the Mercedes from Laiss and that he paid $5,000 in a cashier's check to Gross. Defendant stated that Gross brought the car to his apartment on Ravenswood Avenue sometime in August 1990. Laiss told defendant that the vehicle was in good shape and that she was selling it because she needed the money. Defendant stated that he had not repainted the car, but that he had the air conditioning fixed and the motor replaced. Defendant also related briefly the deal regarding the Jaguar sold in Crestwood.

Schulz contacted Laiss, who came down to the station at about 6 p.m. At that time, Laiss said to defendant "I never talked to you about any car. You're lying." Defendant did not respond.

On January 24, 1991, Schulz met with Purze at 800 North Clark Street, Chicago, and saw a 1988 red Mercedes 300E. An examination of the car revealed an obviously counterfeited public VIN affixed to the vehicle. Schulz saw that the metal Federal tag in the driver's door jamb was missing and saw a mylar sticker on the left rear door bearing a different VIN which checked out as stolen. The VIN aroused Schulz' suspicion because the number was engraved rather than embossed and was not affixed properly.

Schulz stated that after talking with Gross, the police recovered other vehicles with VIN tags removed.

On cross-examination, Schulz stated that he did not take Gross into custody in connection with the stolen 1974 Mercedes, because he had no evidence against Gross, and that he was acting only to assist the Illinois State Police with investigative leads.

Charles Michael Gross then testified on behalf of the State. He admitted that he has used the alias of Charles Michaels. Gross further admitted that in December 1987, he was convicted on three separate cases involving possession of stolen motor vehicles, and sentenced to 75 months' imprisonment. He admitted that he has prior felony convictions and that he was testifying pursuant to an agreement with the office of the State's Attorney. Gross stated that in exchange for truthful testimony concerning defendant and three automobiles in question, he was to receive a reduced sentence of 10 years, and credit for time served in Illinois and Texas.

Gross stated that in 1988 he was imprisoned at a correctional facility in Vandalia, Illinois, and that he met defendant there at a Passover Seder. Gross stated that he and defendant were later cellmates at a correctional facility in East Moline, and that he told defendant he was in prison for various auto related offenses including a tagging operation and a chop shop. Gross told defendant that he would steal cars or have somebody steal cars for him, and actually weld new VINs onto the cars removed from salvaged automobiles. Gross had investors who put up money for the titles on the salvaged cars. Tagging the cars involved changing the VINs from the stolen cars to the VINs removed from the salvage vehicles. He explained that a salvage vehicle is a car that has been recovered from theft and that it would be purchased through an insurance company, an auto parts yard or salvage dealer. Gross stated that he told defendant almost every aspect of his operation while they were living together as cellmates in prison.

While they were at Vandalia, defendant told Gross that he knew people with money and that everybody liked cars and needed the type of cars that Gross was retagging. Defendant suggested to Gross that they could get together and defendant could find customers to purchase the automobiles and that defendant would help Gross finance the salvage in exchange for a profit.

In the spring of 1989, Gross was transferred to East Moline and again met defendant. After approximately a month, they became cellmates. Gross and defendant had further conversations about Gross' operation.

After his release from prison, Gross became involved in an

enterprise with defendant. At that time, Gross was on work release and working for Howard Orlov Imports, a Jaguar dealer in Chicago. Defendant told Gross that he wanted a Mercedes, and Gross obtained for defendant the 1974 Mercedes 450SL. Gross explained how he obtained the Mercedes. Michael Simon, an employee of Motor Works in Barrington, owed Gross money and had given Gross a bad check. To make the check good, Simon gave Gross the keys to the 1974 Mercedes. In July 1990, Gross paid someone to steal the Mercedes on Des Plaines Avenue by old St. Pat's church in Chicago. Gross drove the Mercedes to his apartment at 5235 North Ravenswood Avenue. He then changed the public VIN and the door identification number on the car, using blank VINs that he had in his possession. Gross asked Laiss to put the title to the car in her name and she agreed. Gross did not tell Laiss that the car was stolen, and Laiss never saw the car.

Gross then sold the Mercedes to defendant for approximately $5,000. They arranged to change the color of the car, so Gross met defendant at Tip-Top Auto Body on Damen Avenue, where they had the car painted white. Gross stated that defendant knew all of the above details surrounding the 1974 Mercedes.

In June 1990, while Gross was working on a Jaguar at Howard Orlov, he noticed a master key for a 1988 Mercedes 300E on a customer's key ring. Gross switched the customer's master key with another Mercedes master key. Gross then had someone go to the customer's house and steal the car. Gross retrieved the car from a "safe house" on the North side of Chicago. Gross then removed the public VIN and the door VIN, and replaced them with some salvage VINs he obtained from a car he purchased from Tag's Auto Sales in Wisconsin.

After Gross got the Mercedes, he spoke to defendant. Defendant arranged for financing to enable Gross to purchase the salvage vehicle from Tag's Auto Sales. Gross stated that he told defendant exactly how he obtained the Mercedes. Tag's was paid with checks drawn on Purze's account. Gross delivered the car to defendant, and defendant delivered the car to Purze.

In late October or early November 1990, Gross was doing service work on a Jaguar. While he was testing the car after repairing it, he had a duplicate key made for the car and later stole the car. Gross then removed the public VIN, door sticker, and some of the mylar identification stickers, and replaced the door tag with a counterfeit mylar vehicle identification sticker. Gross asked defendant if he could keep the Jaguar at his apartment on Orleans. Gross told defendant that the Jaguar did not have any VINs, and that Gross did not have

any good paperwork on the car. Gross gave defendant the key to the Jaguar in the event that he had to move it, but told defendant not to drive it too much. Gross told defendant that he had stolen the Jaguar.

About a week or two later, defendant told Gross that he had a buyer for the Jaguar. Gross responded that the car should not be sold because he did not have clean titles or VINs for the car. Defendant told Gross not to worry, that Ebel, the prospective buyer, was straight and the deal would be fine. Gross agreed to meet defendant and Ebel at Ebel's hardware store in Crestwood on December 16 or 17, 1990, to answer any possible questions from Ebel's mechanic. Defendant and Gross drove to Crestwood together in the Jaguar. Ebel asked about the missing VINs. Either defendant or Gross responded that the car was obtained through theft recovery. The sale was not completed that day. Gross called Tag's and said he needed paperwork immediately on a 1989 Jaguar, and Tag's located a car in Florida. Defendant arranged with Tag's to have the title faxed to Ebel. Gross never saw the title that defendant obtained from Tag's.

On December 19, 1990, defendant called Gross and told him that they were to meet Ebel at his bank to get a deposit on the car. Gross told defendant that there were no numbers on the car, and defendant assured Gross that he had told Ebel that repairs were being done on the car and that Gross would have plenty of time to switch the numbers. Gross met defendant at the Palos Bank. Gross drove a Cadillac Seville. Defendant drove the Jaguar to the bank. The bank was closed, and they parked in the empty parking lot. Gross told defendant that something was wrong. Defendant checked the bank to see if it was open or if Ebel was there. Gross told defendant they should get out of there. They started to put the license plate back on the Jaguar when the police arrived. Gross and defendant were arrested.

On cross-examination, Gross admitted that he has been an auto thief for most of his adult life. He admitted to having at least six prior felony convictions. Gross was hired at Howard Orlov with full knowledge of his criminal background. Gross informed the State's Attorney of the names of others involved in his theft operation, but his agreement involved only testifying against defendant. He admitted that he had pleaded guilty to other auto thefts.

Gross stated that he agreed to cooperate with the police once defendant gave the police his name, because he wanted to "get out of that any way I could." He told the police that defendant knew that Gross had four or five garages where Gross stored stolen vehicles and that defendant had one garage on the North side where a stolen 1990 Corvette was parked. Gross stated that defendant put up money for the Corvette. Gross stated that defendant financed several other

stolen vehicles that Gross stored in his garages. Gross stated that defendant paid $7,500 for the 1974 Mercedes, including the paper work.

Gross admitted that the Cadillac he drove on December 19, 1990, was not stolen, but that he had lied to the police at that time and told them that it was an insurance give up. Gross admitted that after he made the deal with the State's Attorney, he continued to steal automobiles and retag them. He ultimately fled the jurisdiction and was arrested in Texas for possession of a stolen vehicle. Gross admitted that he made the deal with the State's Attorney partly because defendant did not help pay his bond money after he was arrested.

Gross stated that he has operated legitimate businesses in addition to illegal tagging operations, including a dealership called Exotic Coach Works, from which many of the cars he sold were not stolen.

Following this testimony, the State then rested its case, and the trial court denied defense counsel's motion for a finding of not guilty.

The defense recalled Officer Fitzgerald as a witness. Fitzgerald agreed that Gross told him that defendant did not like to use his own money on the car deals. Gross told Fitzgerald that defendant had several garages around the city where defendant stored stolen vehicles, but did not give the officer the addresses of the garages.

Defendant testified on his own behalf. He stated his occupation as a ticket broker. He received his GED high school equivalency degree while imprisoned at the Vandalia correctional facility. Defendant stated that he first met Gross at a club on Rush Street. At that time, Gross had an automobile dealership called Exotic Coach Works.

Defendant stated that his next contact with Gross was at a Passover Seder in 1988 while he was imprisoned in Vandalia. Defendant and Gross were only together for a couple of months. When defendant left Vandalia and transferred to the Logan Correctional Center, Gross remained in Vandalia. In 1989, defendant was transferred to the East Moline Correctional Center. Defendant and Gross were together as cellmates at East Moline for a few months. Gross told defendant that he was in for auto-related offenses.

Defendant was released from East Moline in April 1990 and was placed on parole. Gross had been released the prior year. Defendant went back into the ticket business. A few weeks later, Gross contacted defendant, and they met for dinner. Gross told defendant that he was working as the head mechanic for Howard Orlov. Gross told defendant that he wanted to open up a dealership on his own and that Orlov would help him.

Defendant told Gross that he was interested in purchasing a car,

but that he did not have much money. Gross told defendant that he would get back to him. Later, Gross told defendant that he had a 1974 Mercedes available. Gross told defendant his girlfriend owned the car and that it ran well. Gross stated that he wanted $7,500 for the car, and that she was selling it because she needed the money. In August 1990, defendant paid Gross $5,000 by money order, and $2,500 in cash for the Mercedes, and received a signed title bearing Laiss' signature. Defendant put his vanity license plate, "TIX," on the car, but did not transfer the plates and title into his own name until November 1, 1990.

Defendant stated that he saw Laiss several times during the summer and she asked him how he liked the car. Defendant asked Laiss how the car ran when she had it and Laiss responded that the car ran well.

After defendant was arrested in January 1991, he told the officers that he bought the Mercedes from Laiss. He acknowledged that after Laiss was brought to the police station, she said that defendant was lying and that she had never talked to him about a car. Defendant stated that he did not respond to Laiss at that time because he did not want to get her into any further trouble.

In the fall of 1990, Gross contacted defendant and said he had a 1988 Mercedes available for sale, and asked defendant if any of his ticket customers would be interested. Defendant contacted several people, some of his clients, his dentist, and his barber. Defendant then talked to Purze, whom he met through his dentist. Gross told defendant that his minimum commission would be $1,000 for the car, depending on the profit Gross made.

Gross told defendant that he wanted $17,500 of the payment for the Mercedes by check, payable to Tag's Auto Sales, and $3,500 in cash. Purze refused to give defendant any cash, and wrote a check for $3,500, payable to defendant. Defendant then cashed the check and gave the money to Gross. Defendant stated that he did not keep any money out of the transaction. Gross told defendant that when the deal was complete, he would receive his commission. Defendant picked up the car from Gross at the Orlov dealership and delivered the car to Purze's office at 800 North Clark Street.

Subsequently, Gross asked defendant if he knew anyone who wanted a 1987 Mercedes. Defendant told Purze, who was looking for another car for his wife. Purze agreed to pay $21,000 or $22,000. Defendant corroborated Purze's testimony regarding payment for the 1987 Mercedes. Defendant told Purze to make out the check to Charles Michaels rather than defendant, because he did not want to pay taxes on money that he was not going to receive. Defendant gave the two checks to Gross.

Defendant stated that Gross gave him a Jaguar to drive. Defendant stated that Gross told him he could sell the Jaguar for $23,000 or $24,000. Gross showed the Jaguar to several people. Defendant corroborated Ebel's testimony regarding their meeting at a barbershop and arrangements for Ebel to purchase the Jaguar. Gross accompanied defendant to meet Ebel and Wolff in Crestwood. Wolff asked defendant about the VIN plate missing from the window. Defendant stated that up until that time, he was not aware that the VIN was missing. Defendant asked Gross about it and Gross said that the when the car was recovered, the windshield was cracked, and that when they replaced the windshield, the tag broke off. Gross stated that a new tag was ordered through the factory. Defendant relayed this information to Wolff. Defendant denied any contact with Tag's regarding the title. Defendant stated that he expected to make $4,000 from the deal.

Defendant denied that he had any garages wherein he stored stolen cars and stated that he never paid any money toward stolen cars. He had no idea that the 1974 Mercedes he bought from Gross was stolen, nor did he know that the 1988 or 1987 Mercedes was stolen.

On cross-examination, defendant admitted that he was a deputy sheriff in the Cook County court system at one time. Defendant stated that he only worked three days total in a period of three years. Defendant admitted that he initially met Gross while they were in prison in Vandalia and that they were cellmates in East Moline. Defendant denied that Gross talked to him about stealing cars, and he did not know that Gross was in prison for stealing cars. Defendant knew that Gross had committed auto-related offenses.

Defendant stated that when he got out of prison, and Gross said he could sell him a car, defendant asked Gross if the car was stolen and Gross responded that it was not and that it belonged to his girlfriend. Defendant stated that he did not know the other cars were stolen. Defendant thought the cars were repossessed, and he knew nothing about how cars were repossessed. Defendant stated that after his arrest in December 1990, he called the Secretary of State to find out if his 1974 Mercedes was legitimate, and they said the car was fine.

Defendant knew that Gross used the name Charles Michaels and that it was not Gross' real name. He asked Gross about it, and Gross responded that it was his business name. Defendant's suspicions were not aroused by the fact that Gross was not using his real name, because Gross had used that name when he owned an auto dealership. Defendant did not see anything wrong with Gross selling cars because Gross was very well liked at Orlov.

The defense rested, and following closing arguments, the trial court found defendant guilty on all counts. After a subsequent hearing, the trial court sentenced defendant to seven years' imprisonment.

OPINION

Initially, defendant contends that the State failed to prove him guilty of the offenses charged against him beyond a reasonable doubt. Defendant argues that the State failed to prove that he had the statutory *mens rea* of knowledge, which is an element required to prove automobile-related offenses charged under section 4—103 of the Vehicle Code. See Ill. Rev. Stat. 1989, ch. 95¹/₂, pars. 4—103(a)(1), (a)(2), (a)(4).

Defendant argues that the State failed to prove that he had knowledge that the various vehicles at issue were stolen because Gross testified as a result of a deal with the prosecution. Defendant provides no citation to authority for this proposition. Defendant further argues that there is no other evidence against him outside of Gross' testimony.

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the crimes charged against defendant. The element of knowledge may be established by proof of circumstances that would cause a reasonable man to believe that the property had been stolen (*People v. Williams* (1976), 44 Ill. App. 3d 143, 147, 358 N.E.2d 58), and where possession has been shown, an inference of defendant's knowledge can be drawn from the surrounding facts and circumstances. (*People v. Mijoskov* (1986), 140 Ill. App. 3d 473, 477, 488 N.E.2d 1374.) The trier of fact need not accept the defendant's explanation, but may consider its probability or impossibility in light of the surrounding circumstances. *People v. Nivens* (1992), 239 Ill. App. 3d 1, 6-7, 603 N.E.2d 1275.

■ The record reveals that the present case turns on the credibility of the witnesses, which is a determination to be made by the trier of fact. (*People v. Abdullah* (1991), 220 Ill. App. 3d 687, 693, 581 N.E.2d 67.) Here, the trial court heard the testimony of witnesses Ebel and Purze, who stated that defendant approached them about purchasing a "repossessed" Mercedes and Jaguar, respectively. Purze testified that he in fact paid for two cars, the second car sight unseen, but never received the second car, nor the return of his money. Ebel testified that the VIN was missing from the Jaguar he sought to purchase. Gross corroborated the testimony of Ebel and Purze, explaining that he met defendant in prison and that they planned to

work together operating an enterprise for the purpose of selling stolen cars. Laiss testified that defendant lied to the police when he told them that she had sold him a 1974 Mercedes.

The record shows that the trial judge took into account all of Gross' prior convictions in determining that he, and the other witnesses were more credible than defendant. The trial court indicated that although he viewed Gross' testimony with suspicion, considered along with the testimony of other witnesses, he found Gross to be truthful. Under the circumstances, defendant's knowledge was proven, and the trial court properly found defendant guilty beyond a reasonable doubt.

Next, defendant argues that the trial court violated his due process rights by improperly considering evidence outside of the record.

Defendant first contends that the trial judge undertook a private investigation of the facts when he commented that there was no business necessity to advance money on repossessed cars. The record shows that the trial court made the following comment at the conclusion of the trial:

> "Mr. Purze * * * testified that after buying the first automobile and not even receiving an assignment of title, not that he had to have the real title, but not even having the assignment of title tendered to him he accepted the automobile.
>
> That may be naive, but that prior to even receiving that assignment he then advanced Twenty Thousand Dollars on another luxury automobile he had never even seen, hadn't driven, hadn't inspected; and that rings bells as Mr. Obbish would say. It seemed to defy common sense that Mr. Purze would put Twenty Thousand Dollars down on an automobile sight unseen.
>
> * * *
>
> And why would Mr. Kaye ask of that type of money in advance on a sale of a repossessed car unless Mr. Kaye knew that this was not a repossessed car? There's no business necessity for a repossessed automobile to be involved in the transaction of that type."

Defendant argues that the last statement of the trial court was improper based on *People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143. There, the defendant's alibi included a statement that there were no gas stations on a certain road. The trial court commented, "I happen to know different. I don't believe his story." The supreme court ruled that the trial judge's comments constituted an improper private investigation of the facts of the case and reversed Wallenberg's conviction. *Wallenberg*, 24 Ill. 2d at 354, 181 N.E.2d at 145.

Defendant further cites as analogous *People v. White* (1989), 183 Ill. App. 3d 838, 539 N.E.2d 456. There, the complainant, Jackson, charged that defendant, White, cut Jackson's wrist with a knife during an altercation. White denied having a knife. Other witnesses testified that they did not see White with a knife, but that bottles were thrown around. The trial judge examined the cut on Jackson's arm and concluded that Jackson was cut with a knife based on his own observations that "Most broken bottles [are] round—if there is a flat part it's on the bottom and normally when a bottle breaks it doesn't break in a perfectly straight line." The court further stated: "Glass tends to break in a jagged fashion *** The nature of the cut— it's a straight cut. *** It doesn't add up." (*White*, 183 Ill. App. 3d at 840.) The trial court concluded that the State had proved the charge by a preponderance of the evidence.

On appeal, the *White* court found that the trial judge erred in considering facts not in evidence at trial, *i.e.*, the distinction between glass and knife cuts, and reversed and remanded the cause. *White* 183 Ill. App. 3d at 841.

■ *Wallenberg* and *White* are distinguishable from the present case. Here, there is no indication that the trial judge embarked on a private investigation of the facts. The record shows that the trial court considered the testimony of Purze regarding his attempted purchase of a 1987 Mercedes, and of Gross, regarding the preparation of a stolen 1987 Mercedes for sale, and merely remarked on the suspiciousness of the circumstances. As such, the trial court's comments were not improper.

Defendant further argues that the trial court improperly drew an adverse inference that Purze knew the cars were stolen, based on the fact that Purze had an attorney present during his testimony. Defendant finds the following comments by the trial court objectionable:

> "Mr. Purze, the record will show, came to court and the Court inquired as the person sitting in the courtroom in the jury box with [sic] is [sic] personal attorney."

Defendant notes that the record shows that the following colloquy occurred prior to Purze's testimony:

> "THE COURT: Your name for the record?
> MR. STAVINGS: I'm Richard Stavings, S-T-A-V-I-N-G-S
> THE COURT: You represent?
> MR. STAVINGS: Mr. Purze."

■ Defendant fails to cite any authority in support of this contention and therefore has waived this issue for review by this court. (*People v. Barlow* (1989), 188 Ill. App. 3d 393, 405, 544 N.E.2d 947.) While defendant argues that the authority cited for his previous

contention, *Wallenberg* and *White*, applies to this issue as well, defendant does not attempt to explain how these cases support his contention, other than to say that the trial court relied on matters outside the record. Defendant's contention is unsupported by the record and therefore does not merit review.

Defendant further contends that the trial court committed reversible error when it considered defendant's demeanor while Gross was testifying. Defendant objects to the trial court's comments as follows:

> "The testimony of Mr. Gross had to be looked at with great suspicion. Inspite [*sic*] of the fact that the Court looked at it with great suspicion the Court also noted the reaction of the defendant while Mr. Gross was testifying, in particular when Mr. Gross was testifying as to his motivation for testifying against Mr. Kaye, and Mr. Kaye's own demeanor at that time was telling."

Defendant contends that the trial judge placed great significance on defendant's demeanor while Gross was testifying, and that this reliance is outside of the record, because there is nothing in the record to show what defendant did while Gross was testifying. Defendant has cited no authority to support this contention.

■ Judging the credibility of witnesses is the function of the trier of fact, which is in a superior position "to evaluate their demeanor, sincerity, and the weight to be afforded their testimony than is a court of review." (*People v. Ramey* (1992), 151 Ill. 2d 498, 550, 603 N.E.2d 519.) The record shows that Defendant testified as a witness on his own behalf. We therefore conclude that the trial court's comment about defendant's demeanor was not improper.

Next, defendant contends that the trial court improperly permitted the State to elicit testimony from Gross that he was in prison with defendant, and then improperly allowed the State to use Gross' testimony to show defendant's propensity to commit crimes. The State responds that defendant has waived this issue for review for failure to both object at trial and to raise the issue in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) In the alternative, the State argues that the evidence was properly admitted within the sound discretion of the trial court. *People v. Illgen* (1991), 145 Ill. 2d 353, 364, 583 N.E.2d 515.

It is true that prior felony convictions of a criminal defendant are not admissible for the purpose of showing the defendant's disposition or propensity to commit crime. (*Illgen*, 145 Ill. 2d at 364.) Evidence of other crimes is admissible, however, where relevant to prove a defendant's "guilty knowledge" or "consciousness of guilt" of the crime at issue. *People v. Woods* (1984), 122 Ill. App. 3d 176, 179, 460 N.E.2d 880.

■ In the present case, defendant was charged with "knowledge" that certain vehicles were stolen and the VINs altered. Defendant's defense was that he lacked this requisite "knowledge." Therefore, admission of Gross' testimony that he and defendant were cellmates in prison and that they discussed embarking on business together selling stolen cars was relevant to show defendant's knowledge. Thus, the testimony was properly admitted.

Next, defendant contends that the trial court erred in permitting Officer Fitzgerald to testify corroborating the out-of court statements of Gross. The record shows that during direct examination of Officer Fitzgerald, the prosecutor twice attempted to ask Officer Fitzgerald whether he believed that Gross told him a lie. The trial court sustained defense counsel's objections to these questions. Subsequently, the trial court asked the following question of Officer Fitzgerald, to which defendant now objects:

> "THE COURT: Officer, do you have any personal knowledge of any facts through your independent investigation which are contrary to what Gross told you when you interviewed him at that time?
>
> FITZGERALD: No, sir, I do not."

Defendant argues that the inquiry of the trial court improperly elicited the officer's opinion as to whether Gross told him the truth. Defendant cites in support *People v. Matthews* (1990), 205 Ill. App. 3d 371, 562 N.E.2d 1113, for the proposition that it is improper for the prosecution to repeatedly ask the defendant whether the witnesses for the State lied in their testimony against him.

The facts of *Matthews* do not correspond to the facts of the present case. Defendant here objects to a question asked of a State witness police officer regarding the results of his investigation, not to questions asked of him during his own cross-examination.

■ However, we find that the trial court's inquiry was improper under *Matthews* because it tended to bolster the testimony of Gross. It is the general rule that a prior out-of-court statement may not be used to bolster or corroborate a witness' in-court testimony. (*People v. Matthews* (1990), 205 Ill. App. 3d 371, 414, 562 N.E.2d 1113, citing *People v. Davis* (1984), 130 Ill. App. 3d 41, 54, 473 N.E.2d 387, 397.) Nevertheless, this error is harmless, in light of both the trial court's statement that he would not give much weight to this testimony, and the overwhelming evidence of defendant's guilt presented at trial.

■ Finally, defendant contends that the trial court erred in denying defendant's post-trial motion to bar admission of his prior felony conviction during sentencing proceedings. Defendant cites as authority the case of *Grady v. Corbin* (1990), 495 U.S. 508, 109 L. Ed.

2d 548, 110 S. Ct. 2084. Defendant acknowledges that *Grady* was overruled by the United States Supreme Court in *United States v. Dixon* (1993), 509 U.S. ___, 125 L. Ed. 2d 556, 113 S. Ct. 2849, on June 27, 1993, four months prior to the filing of his brief on October 26, 1993. Because defendant relies on authority which has been overruled in support of his contention, this issue does not merit our consideration.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

BUCKLEY and MANNING, JJ., concur.