2023 IL App (2d) 220169
No. 2-22-0169
Opinion filed February 27, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-864 |
| CASEY F. PURTA, | ) ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Jorgensen and Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial in the circuit court of McHenry County, defendant, Casey F. Purta, was convicted of disorderly conduct for knowingly making a false complaint to a public safety agency. 720 ILCS 5/26-1(a)(6) (West 2020). Defendant argues on appeal that the State failed to prove his guilt beyond a reasonable doubt. We reverse.

¶ 2                                          I. BACKGROUND

¶ 3    At trial, William Worley testified that he was employed by Mattress Firm as a district manager. Defendant was employed at a Mattress Firm location in McHenry, within Worley's district. On June 1, 2020, Worley spoke with his staff, including defendant, about civil unrest

occurring throughout the nation.[1] He told his staff members to contact him if they felt uneasy, and then a decision would be made whether to close a Mattress Firm location for safety reasons. Later that day, shortly before 5 p.m., Worley received a call from defendant stating that he was "frightened" because "a couple of vehicles pulled into the parking lot, parked erratically, and two or three individuals got out of the car, one with a shotgun, another with an AK-47 type assault rifle, and walked by the front of the store." (On cross-examination, Worley testified that he did not recall whether defendant said he actually saw the men emerge from the vehicles or only saw them coming from that direction.) Worley told defendant to lock the front door if it was safe to do so, seek shelter in the back storage room, and dial 911.

¶ 4    After defendant's call, Worley called Michael Glenky, Mattress Firm's regional vice president. Glenky decided to close all 100 Mattress Firm locations in the Chicagoland region because of "the civil unrest that had been going on during that time period and the riots and so forth that had taken place throughout the market." Glenky also called Mattress Firm's loss prevention director, Michael Deprey. Worley testified that he was aware that Deprey contacted law enforcement authorities. The parties then stipulated that Deprey made the report.

¶ 5    After speaking with Glenky, Worley called his other nine Mattress Firm locations and told them to close for the day. Worley then called defendant again. Defendant wanted to leave, but

---

[1]Worley was apparently referring to protests that followed the death of George Floyd during an encounter with police. See, *e.g.*, Braxton Booker, Bill Chappell, David Schaper, Danielle Kurtzleben, & Joseph Shapiro, *Violence Erupts as Outrage Over George Floyd's Death Spills Into a New Week*, NPR (June 1, 2020) https://www.npr.org/2020/06/01/866472832/violence-escalates-as-protests-over-george-floyd-death-continue [https://perma.cc/ZS46-TBWN].

because the armed men were still unaccounted for, Worley advised defendant to lock the door and shelter in the back. Worley told defendant to cooperate with the police and then "get out of there." Worley went to the store after things "calmed down." Defendant had already left. Defendant and Worley spoke again later. Defendant was scheduled to work on June 2, 2020, and he advised Worley that he thought he would be able to do so. Later, however, defendant texted Worley, indicating that "he didn't realize how shaken up he was given the situation." Defendant asked for the day off. On cross-examination, Worley testified that, in his experience, defendant had been an honest employee.

¶ 6    Maria Joseph, a 911 dispatcher for the City of McHenry, testified that at approximately 5 p.m. on June 1, 2020, she received a call through a nonemergency number. The caller reported "two suspicious males, possibly armed, with vests approaching a mattress store." The caller, whose name Joseph did not recall, identified himself as the store's manager. However, he said he was not on the premises. Rather, he had received the information about the incident from an employee hiding in the store.

¶ 7    Craig Hampton testified that, in the mid to late afternoon on June 1, 2020, he and some friends were sitting in lawn chairs in the parking lot of a Starbucks located about 200 yards from Mattress Firm. During the half to one hour that he was at Starbucks, Hampton did not see an individual holding a firearm or an object that could be mistaken for a firearm. Lia McCoo testified that on June 1, 2020, she and her friend Karen Dulski met at the same Starbucks at about 4 to 4:30 p.m. and drank their beverages in McCoo's vehicle. The vehicle was facing away from Mattress Firm, but McCoo could see Mattress Firm in her rearview mirror. At no time did she see anyone walk by carrying a firearm or an object that could be mistaken for a firearm. Although Dulski

testified that she was mostly facing forward and not looking at Mattress Firm, she saw no civilians carrying assault rifles, shotguns, or anything one could mistake for such weapons.

¶ 8    McHenry police officer Christina Noyes testified that she was dispatched to Mattress Firm to respond to a report of two suspects wearing camouflage and bulletproof vests and carrying assault rifles. Noyes and her partner, Officer Popp, confronted defendant, who was then seated in his white Toyota Prius. (For reasons that need not be detailed here, Noyes had been advised that the armed suspects might have arrived in that vehicle.) Noyes did not recall whether she or Popp had their guns drawn when they first approached defendant. After determining that defendant was an employee of Mattress Firm—not one of the suspected armed men—Noyes and Popp, along with several other officers, searched the vicinity, including a nearby wooded area, but did not find any armed men. They then released defendant from the scene, but later called and asked him if he would be willing to return and answer questions. Defendant agreed.

¶ 9    Noyes subsequently tried to get in touch with defendant by leaving voicemail messages for him, but he never returned her calls. A few days after the incident, she went to Mattress Firm. Defendant was there but did not greet Noyes in any way and did not seem pleased that she was there. Noyes asked defendant if he would voluntarily come to the police department to speak with her. Defendant responded that he was unable to do so because he was working. She asked if defendant would be available the following day. He said he had plans and would not be in the area. Noyes asked if defendant wanted to speak with her. He responded that he had nothing more to tell her. Following Noyes's testimony, the State rested.

¶ 10    Defendant called two witnesses who testified that he had a reputation for honesty. Defendant also testified on his own behalf that on June 1, 2020, at around 2:30 p.m., he was part of a Microsoft Teams chat meeting where the participants discussed the current social unrest and

protests. The discussion participants were advised to contact their district manager if they saw "anything regarding" the unrest or protests. Shortly before 5 p.m., defendant was sitting at his desk when he saw two men walk past the store. He got a clear view of one of the men. That man was wearing a black vest over a camouflage T-shirt and was carrying a weapon. Later, defendant testified that both men "were holding what [he] thought were assault rifles." According to defendant, the store faced west, and the men were walking north. Defendant testified that, after seeing the men, he walked to the front of the store and looked around. He stepped outside but did not see the two men. Defendant did see two vehicles parked "askew" that he had not seen before he saw the men. Defendant assumed that the men had arrived in the vehicles. (In fact, the record reveals that the vehicles belonged to McCoo and Dulski.) Defendant called Worley and told him what he had seen. Worley told him to "lock up the store and to call the police and to stay safe until the police had arrived." Worley further told defendant that he could leave when the police arrived.

¶ 11    After the call ended, defendant started closing procedures. He cleaned up the store and gathered the trash. Then he looked for the McHenry Police Department's nonemergency number. Defendant explained that he did not believe the situation was an emergency. While defendant was looking for the nonemergency number, Worley called back. While speaking with Worley, defendant took the trash out. At that point, he saw some squad cars in the area. Defendant told Worley that the police had been called, but he did not tell Worley that he (defendant) had called the police. After that call ended, defendant locked the back door and walked to his car. When he got in his car, squad cars and police officers immediately surrounded him with their guns drawn. Defendant told Officer Popp that he was the one who had reported the incident. Officer Popp then "dismissed" defendant, and defendant started driving home. Before he arrived, he received a phone call from Noyes. She asked him to return to the scene and talk to her. Defendant returned to the

scene and spoke with Noyes again. Defendant testified that he never called the police. He did not think there was an emergency or a crime was being committed.

¶ 12    The trial court found defendant guilty of disorderly conduct based on his call to Worley, in which he reported the presence of armed men outside Mattress Firm. The court found, *inter alia*:

> "Certainly anytime someone reports seeing two men with weapons in bulletproof vests in a *** retail shopping area at 5 p.m. ***, there could be an emergency response. It would seem axiomatic that someone reporting this information would be consciously aware that an emergency response is practically certain to result."

¶ 13    After denying defendant's posttrial motion, the court sentenced defendant to an 18-month term of conditional discharge. This appeal followed.

¶ 14                                        II. ANALYSIS

¶ 15    Defendant maintains that his report to Worley that armed men were outside Mattress Firm was not a sufficient basis to convict him of disorderly conduct for knowingly making a false complaint to a public safety agency. A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When the sufficiency of the evidence is challenged, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The trier of fact has the responsibility to assess the credibility of the witnesses, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences therefrom." *People v. Ressa*, 2019 IL App (2d) 170439, ¶ 42. We will not

substitute our judgment for that of the trier of fact on questions of the credibility of the witnesses or the weight of the evidence. *Id.*

¶ 16　Section 26-1(a)(6) of the Criminal Code of 2012 (Code) (720 ILCS 5/26-1(a)(6) (West 2020)) provides, in pertinent part:

"(a) A person commits disorderly conduct when he or she knowingly:

* * *

(6) Calls the number '911' or transmits or causes to be transmitted in any manner to a public safety agency for the purpose of making or transmitting a false alarm or complaint and reporting information when, at the time the call or transmission is made, the person knows there is no reasonable ground for making the call or transmission and further knows that the call or transmission could result in the emergency response of any public safety agency[.]"

¶ 17　Defendant first argues that the State failed to prove beyond a reasonable doubt that he *knowingly* caused transmission to the McHenry Police Department of a report of armed men outside Mattress Firm. Second, defendant alternatively argues, in essence, that the State failed to prove beyond a reasonable doubt that defendant knew that there was no reasonable ground for making the transmission. According to defendant, the State failed to prove that the information defendant conveyed to Worley was false, let alone that defendant knew it was false. We accept defendant's first argument and need not consider his second.

¶ 18　The State insists that it was required to prove only that defendant knew his call to Worley "*could*" result in an emergency response by a public safety agency. That is simply incorrect. In a prosecution under section 26-1(a)(6) of the Code, the State must prove *both* that the defendant knowingly "*transmits or causes to be transmitted in any manner*" information to a public safety

agency and that the defendant "*further knows*" the transmission could lead to an emergency response. (Emphases added.) *Id.* Unless the State first proves that the defendant knowingly transmitted, or caused to be transmitted, information to a public safety agency, it is of no consequence whether the defendant knew that such information could lead to an emergency response.

¶ 19    It is undisputed that defendant did not himself transmit information about the armed men to a public safety agency. The salient question is whether, by calling Worley, defendant knowingly caused that information to be transmitted. Only if the answer to that threshold question is "yes" is it necessary to consider whether defendant "*further* [knew] that the call or transmission could result in the emergency response of any public safety agency." (Emphasis added.) *Id.*

¶ 20    Section 4-5 of the Code (720 ILCS 5/4-5 (West 2020)) provides, in pertinent part:

"A person knows, or acts knowingly or with knowledge of:

***

(b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is *practically certain* to be caused by his conduct." (Emphasis added.)

¶ 21    Thus, to prove defendant knew his call to Worley would result in someone contacting a public safety agency, the State was obligated to prove that defendant was consciously aware that that result was practically certain to occur. Knowledge is often proven with circumstantial evidence (*People v. Maples*, 2018 IL App (2d) 160577, ¶ 31), and at least in some settings, knowledge may be established with reference to what a reasonable person would know under the circumstances (see, *e.g.*, *People v. Miller*, 2013 IL App (1st) 110879, ¶ 55 ("Whether defendant had knowledge [that the vehicle was stolen] 'may be established by proof of circumstances that

would cause a reasonable man to believe that the property [was] stolen.' " (quoting *People v. Kaye*, 264 Ill. App. 3d 369, 383 (1994)))). Here, given the national climate of civil unrest following George Floyd's death and the Microsoft Teams chat earlier in the day, we believe a reasonable person in defendant's circumstances would be aware that it was likely or perhaps even probable that the call to Worley would result in someone contacting a public safety agency. However, we do not believe a reasonable person would be aware that such a result would be "practically certain." The average reasonably knowledgeable person would not necessarily know whether it is legal to openly carry long guns, including assault rifles, in Illinois. Moreover, defendant did not report the presence of armed men in connection with the kinds of incidents of civil unrest that were the subject of the Microsoft Teams chat. Under these circumstances, it is unreasonable to infer that defendant was consciously aware that it was practically certain that his call to Worley would result in someone contacting a public safety agency. Because the State failed to prove that defendant knowingly caused the report of armed men to be transmitted to a public safety agency, we must reverse defendant's conviction.

¶ 22                                    III. CONCLUSION

¶ 23    For the reasons stated, we reverse the judgment of the circuit court of McHenry County.

¶ 24    Reversed.

***People v. Purta*, 2023 IL App (2d) 220169**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 20-CF-864; the Hon. Michael E. Coppedge, Judge, presiding. |
| **Attorneys for Appellant:** | Jed Stone, of Stone & Associates, Ltd., of Waukegan, for appellant. |
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |